UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COURTHOUSE NEWS SERVICE,

                                    Plaintiff,

                        vs.                                    Civil Action No.:  16-CV-_____( )

MILTON TINGLING, in his official capacity
as County Clerk of New York County, New
York,

                                    Defendant.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff Courthouse News Service ("CNS"), by and through its undersigned attorneys,

alleges the following in support of its Complaint for Injunctive and Declaratory Relief:

## INTRODUCTION

1.      The First Amendment provides the press and public with a presumptive right of

access to civil complaints filed with the court.  Grounded in the right of free expression, courts have

recognized that where the right of access applies, such access must also be timely, and delays in

access are the functional equivalent of denials of access.  Timely access to new civil complaints is

fundamental to the public's ability to know what is happening in an important branch of government,

and it is essential to accurate and fair news reporting of new civil disputes.

2.      But at New York State Supreme Court, County of New York ("New York Supreme"),

since the advent of electronic filing ("e-filing"), newly filed complaints are not made available to the

public or press in a timely manner.  In recent months, on average, approximately one out of every

three newly filed civil complaints is withheld from review by interested members of the press and

public until the day after the complaint is filed, at the earliest.  And it is not uncommon for two, three, four, or even five days to pass before the complaint is made public.

3.     Upon information and belief, much of the current delay in access to newly filed civil complaints in New York Supreme is due to the County Clerk's policy and practice of not providing access to new complaints until after clerical processing, a series of administrative tasks concluding with the assignment of an index number, at which time the Clerk's office deems the filing "official" and a court record.  Only then is the complaint made available to the public and press.  The Clerk takes this position even though current rules put an affirmative obligation on the filing parties to omit or redact confidential personal information in papers submitted to the court and despite a decades-long tradition at New York Supreme, under which the press had direct access before clerical processing to all newly filed complaints.

4.     By contrast, new complaints filed in the Southern District of New York, where cases are also electronically filed, are automatically assigned a case number and flow onto the Public Access to Court Electronic Records ("PACER") website, where they are available to the public and press upon filing and without processing by court personnel.  This practice continues the pre-processing access that existed before the transition to e-filing, when complaints were paper-filed. The three other District Courts in New York State also make newly filed complaints available to the public and press upon filing and before processing, as do the vast majority of District Courts across the nation, along with several state courts that have transitioned from paper to e-filing.

5.     By withholding access to civil complaints until after clerical processing and thereby denying CNS and the public timely access to newly filed civil complaints in New York Supreme, these court records are as good as sealed for an appreciable amount of time after filing, in violation

of the rights secured to CNS and the public by the First and Fourteenth Amendments to the U.S.

Constitution.

6.      CNS thus, respectfully, brings this action challenging the legality of Defendant's

actions and seeking injunctive and declaratory relief.  CNS seeks to enjoin acts giving rise to delays

and to compel timely public access to newly filed complaints in New York Supreme.

### JURISDICTION AND VENUE

7.      CNS' claims arise under the First and Fourteenth Amendments to the United States

Constitution and the Civil Rights Act, Title 42 U.S.C. § 1983, *et seq.*  This Court has subject matter

jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory

relief).  Defendant is subject to personal jurisdiction in this District.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b) because, on information

and belief, Defendant's primary place of business is in New York and in this District, and because a

substantial part of the events or omissions giving rise to CNS' claims occurred in this District.

9.      CNS brings this action seeking injunctive and declaratory relief against Defendant

Milton Tingling, in his official capacity as County Clerk of New York County of the State of New

York ("Defendant" or the "Clerk"), to restrain the deprivation under color of state law of CNS'

rights, privileges and immunities under 42 U.S.C. § 1983, *et seq.* and the United States Constitution.

### PARTIES

10.     CNS is a California corporation with its principal place of business located in

Pasadena, California, and is a widely-read legal news service with thousands of subscribers across

the nation.  CNS is similar to other news wire services, such as the Associated Press, except that

CNS specializes in news reporting about civil litigation, from the date of filing through the appellate

level. CNS has more than 2,700 institutional and individual subscribers and many more readers of its freely available website, www.courthousenews.com.

11.     Defendant Tingling is the County Clerk of New York County and is sued in his official capacity.

12.     The County Clerk of New York County is responsible for, among other things, the administration of court records, including at New York Supreme. Acting in his official capacity, Defendant, as well as those acting under his direction and supervision, is directly involved with and/or responsible for acts giving rise to the delays in access to newly filed complaints experienced by CNS. These acts reflect the official policy of the Clerk's office. Defendant's actions and inactions, as alleged in this Complaint, are under the color of New York law and constitute state action within the meaning of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

13.     CNS seeks relief against Defendant as well as his agents, assistants, successors, employees, and all persons acting in concert or cooperation with him or at his direction or under his control.

## FACTUAL ALLEGATIONS

**A.     The Tradition of Access upon Receipt for Filing to New Civil Complaints**

14.     A new complaint serves as the opening bell in a legal contest and, in recognition of the media's crucial role in informing interested persons about new court cases, it has been a longstanding tradition for courts to provide reporters with access to new civil complaints upon receipt for filing, whether or not the clerical tasks associated with the intake of that complaint have been completed. This ensures that interested members of the public learn about new cases in a timely manner and while those cases are still newsworthy.

-4-

15.     In New York Supreme, new complaints are often highly newsworthy and, before e-filing, there was a decades-long tradition of making complaints available to the press corps in a timely manner upon receipt and before being processed by clerks.  Consistently and reliably, new civil complaints filed on any given day were available for review by reporters upon receipt and before processing, which in turn allowed them to be reviewed on the day they were filed.  Since at least as early as 1997, CNS reporters have looked through the new civil complaints that crossed the Clerk's counter in New York Supreme at the end of each day; this was also the practice in many other counties in New York and in cities and counties across America.  But that access changed in New York Supreme with the advent of e-filing.

**B.     CNS Publications and Subscribers**

16.     CNS is a nationwide news service, which began in 1990 out of a belief that great swaths of news about civil litigation went unreported because the traditional news media failed to cover much of the important business of the courts.  CNS now employs more than 300 people, most of them reporters, covering courts in all 50 states in the United States.  In New York, CNS currently employs 14 people, including Northeast Bureau Chief, Adam Angione, a web editor, and 12 reporters who cover the state and federal trial and appellate courts of New York.

17.     CNS offers a variety of publications.  One category is its "New Litigation Reports," which contain original, staff-written summaries of significant new civil complaints.  New Litigation Reports focus on general jurisdiction civil complaints against business institutions, public entities, prominent individuals, or other civil actions of interest to CNS' subscribers.  They do not cover criminal or family law matters, nor do they include collection cases against individuals, name changes, mortgage foreclosures, or probate filings.

291020.7\0549626

18.     To prepare New Litigation Reports, CNS reporters have traditionally visited their

assigned courts near the end of the day, so that they can review all the complaints filed that day to

determine which ones are newsworthy.  Given the nature of the New Litigation Reports, any delay in

the ability of a reporter to obtain and review newly filed complaints necessarily creates a delay in

CNS' ability to inform subscribers and other interested persons of the factual and legal allegations in

those complaints.

19.     Among CNS' other publications are its two print newsletters and an electronic "Daily

Brief," which covers published, nationwide appellate rulings, including all U.S. Supreme Court and

federal circuit decisions, as well as significant rulings from a growing number of federal district

courts, including the four federal districts in New York.

20.     In addition, CNS publishes a freely-available website featuring news reports and

commentary, which is read by roughly one million readers each month.  The website functions much

like a print daily newspaper, featuring staff-written articles from throughout the nation that are

posted and rotate on and off the page on a 24-hour news cycle.

21.     CNS has been credited as the original source of reporting on a topic by a wide range

of publications, including the *ABA Journal*, ABC News, *The Atlantic*, *Austin American Statesman*,

Black Christian News Network, *California Bar Journal*, CBS News, The Daily Beast, *The Christian

Science Monitor*, *The Dallas Morning News*, Forbes, Fox News, *The Guardian*, The Hill, *Houston

Chronicle*, The Huffington Post, *Long Island Press*, *Los Angeles Times*, *Mother Jones*, NBC News,

*New York Daily News, New York Magazine*, *The New York Times*, NPR, *The Orange County

Register*, Politico, *The Telegraph* (UK), *Rolling Stone*, *San Antonio Express-News*, Slate, *Salt Lake

City Tribune, The Washington Times, Women's Health Policy Report*, *U.S. News and World Report*,

291020.7\0549626

*USA Today*, *The Wall Street Journal*, *The Washington Post*, UPI and others.  In addition, U.S.,

Canadian, and New Zealand radio shows have interviewed CNS reporters.

22.     CNS has more than 2,700 subscribers nationwide.  A substantial set of news and

entertainment outlets are CNS subscribers, including but not limited to *The Atlanta Journal*

*Constitution*, *The Boston Globe*, Buzzfeed, *The Dallas Morning News*, *Detroit Free Press*, Fox

Entertainment Group, *Houston Chronicle*, *Los Angeles Times*, *The Salt Lake Tribune*, *San Antonio*

*Express News*, *San Jose Mercury News*, *The Wall Street Journal*, Warner Bros., and many TV

stations.  The Washington-based Center for Public Integrity also subscribes.

23.     Among academic institutions, subscribers to CNS' new litigation reports include

Boston College Law School, Boston University, Case Western Reserve University, Harvard Law

School, Loyola Law School, MIT School of Management, UC Hastings College of Law, UCLA

School of Law, among others.

24.     All but a very few of the nation's large and mid-sized law firms subscribe to one or

more of CNS' publications.  New York City is one of CNS' biggest subscriber bases, with more than

200 of CNS' subscribers having one or more offices in New York City.

**C.    <u>Access to Complaints at New York Supreme</u>**

25.     Prior to the introduction of e-filing, when new paper complaints were submitted for

filing at New York Supreme, a cashier would stamp the complaints with a file date and index

number and immediately place them, unprocessed, in a wire basket.  Throughout the day, reporters

could and did retrieve the new complaints from the wire basket.  This review was conducted at the

Supreme Court Courthouse located in Foley Square, New York, New York (the "Courthouse").

Because the press was able to see every new case that was filed directly from the intake basket and

before processing, 100% of newly filed civil complaints were available to the press on the same day

they were filed. Only after the press reviewed the new complaints did they move on for further processing and placement in file folders on one of the shelves in the records room. If a reporter needed to review an older filing already on the shelves, the reporter was free to move behind the counter and pull the appropriate file.

26.     The introduction of mandatory e-filing in 2013, counterintuitively, created substantial delays in access to newly filed civil complaints—it now often takes days before a case is made available to the press and, by extension, the public.

27.     Upon information and belief, in New York Supreme, much of the delay in providing access to newly filed civil complaints in New York Supreme is due to the Clerk's policy and practice of withholding access to new complaints until after clerical processing, a series of administrative tasks concluding with the assignment of an index number. The Clerk withholds public access to newly filed civil complaints until after processing is completed, at which time his office deems the filing "official" and a court record, and only then is it available to the public and press via the Supreme Court's Records Online Library ("SCROLL"). The Clerk takes this position even though current rules put an affirmative obligation on the filing parties to omit or redact confidential personal information in papers submitted to the court for filing.

28.     In CNS' long experience covering the nation's courts, it has found that the most newsworthy civil complaints are often filed late in the day.

29.     While parties may now e-file a civil complaint 24 hours a day—and the date and time of the complaint's receipt by the Clerk's office is also the date and time of filing for statute of limitations purposes—it is less likely for a civil complaint filed later in the day to be made available to the press on the same day it is filed, and since the Courthouse closes at 5:00 p.m. each day, all

-8-

civil complaints e-filed after that hour are not made available to the public until the next day, at the earliest.

30.    Starting in November 2015 and continuing through September 2016, CNS collected access data at New York Supreme during four time periods (11/12/15-11/20/15; 1/6/16-2/17/16; 4/13/16-5/3/16; and 8/29/16-9/12/16), indicating the rate of delays in public access to the newly filed general civil and commercial complaints that CNS reviewed.  The results reflect access levels with a high degree of variability from day to day, with many instances in which the complaints were not made available for review on the same day ("SD") they were filed, and instead delayed by either one day ("1D") or two or more days ("2D+"), as reflected in the chart that follows:

| DATE | # Compl. Reviewed | SD | 1D | 2D+ | DATE | # Compl. Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|---|---|---|---|---|
| 11/12/15 | 51 | 65% | 35% | 0% | 1/26/16 | 65 | 80% | 20% | 0% |
| 11/13/15 | 84 | 80% | 0% | 20% | 1/27/16 | 67 | 67% | 30% | 3% |
| 11/14/15 | 4 | 0% | 0% | 100% | 1/28/16 | 56 | 79% | 20% | 2% |
| 11/15/15 | 2 | 0% | 100% | 0% | 1/29/16 | 67 | 64% | 0% | 36% |
| 11/16/15 | 89 | 76% | 24% | 0% | 1/30/16 | 4 | 0% | 0% | 100% |
| 11/17/15 | 56 | 82% | 18% | 0% | 1/31/16 | 1 | 0% | 100% | 0% |
| 11/18/15 | 75 | 76% | 24% | 0% | 2/1/16 | 77 | 53% | 47% | 0% |
| 11/19/15 | 75 | 84% | 16% | 0% | 2/2/16 | 71 | 61% | 37% | 3% |
| 11/20/15 | 62 | 89% | 0% | 11% | 2/3/16 | 76 | 79% | 21% | 0% |
| 1/6/16 | 57 | 74% | 26% | 0% | 2/4/16 | 77 | 66% | 34% | 0% |
| 1/7/16 | 54 | 63% | 37% | 0% | 2/5/16 | 38 | 61% | 0% | 39% |
| 1/11/16 | 61 | 74% | 26% | 0% | 2/6/16 | 2 | 0% | 0% | 100% |
| 1/12/16 | 65 | 58% | 42% | 0% | 2/7/16 | 3 | 0% | 100% | 0% |
| 1/13/16 | 67 | 78% | 22% | 0% | 2/8/16 | 61 | 59% | 41% | 0% |
| 1/14/16 | 66 | 74% | 24% | 2% | 2/9/16 | 73 | 68% | 32% | 0% |
| 1/15/16 | 64 | 64% | 0% | 36% | 2/10/16 | 71 | 79% | 21% | 0% |
| 1/17/16 | 2 | 0% | 0% | 100% | 2/11/16 | 90 | 30% | 0% | 70% |
| 1/18/16 | 35 | 0% | 100% | 0% | 2/12/16 | 64 | 0% | 0% | 100% |
| 1/19/16 | 67 | 69% | 31% | 0% | 2/13/16 | 4 | 0% | 0% | 100% |
| 1/20/16 | 68 | 60% | 40% | 0% | 2/14/16 | 3 | 0% | 0% | 100% |
| 1/21/16 | 90 | 73% | 27% | 0% | 2/15/16 | 22 | 0% | 95% | 5% |
| 1/22/16 | 69 | 83% | 0% | 17% | 2/16/16 | 83 | 66% | 34% | 0% |
| 1/23/16 | 2 | 0% | 0% | 100% | 2/17/16 | 5 | 100% | 0% | 0% |
| 1/24/16 | 4 | 25% | 75% | 0% | 4/13/16 | 69 | 68% | 32% | 0% |
| 1/25/16 | 49 | 67% | 33% | 0% | 4/14/16 | 87 | 64% | 36% | 0% |

291020.7\0549626

| DATE | # Compl. Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|
| 4/15/16 | 64 | 67% | 0% | 33% |
| 4/16/16 | 1 | 0% | 0% | 100% |
| 4/18/16 | 83 | 86% | 13% | 1% |
| 4/19/16 | 63 | 75% | 24% | 2% |
| 4/20/16 | 58 | 60% | 38% | 2% |
| 4/21/16 | 54 | 85% | 15% | 0% |
| 4/22/16 | 73 | 56% | 0% | 44% |
| 4/23/16 | 2 | 0% | 0% | 100% |
| 4/24/16 | 3 | 0% | 100% | 0% |
| 4/25/16 | 52 | 79% | 19% | 2% |
| 4/26/16 | 76 | 33% | 67% | 0% |
| 4/27/16 | 66 | 76% | 21% | 3% |
| 4/28/16 | 61 | 43% | 57% | 0% |
| 4/29/16 | 69 | 65% | 0% | 35% |
| 4/30/16 | 3 | 0% | 0% | 100% |
| 5/1/16 | 3 | 0% | 100% | 0% |

| DATE | # Compl. Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|
| 5/2/16 | 64 | 61% | 39% | 0% |
| 5/3/16 | 74 | 82% | 18% | 0% |
| 8/29/16 | 67 | 70% | 28% | 1% |
| 8/30/16 | 75 | 63% | 35% | 3% |
| 8/31/16 | 116 | 51% | 48% | 1% |
| 9/1/16 | 101 | 87% | 13% | 0% |
| 9/2/16 | 50 | 84% | 0% | 16% |
| 9/4/16 | 1 | 0% | 0% | 100% |
| 9/5/16 | 2 | 0% | 50% | 50% |
| 9/6/16 | 55 | 73% | 27% | 0% |
| 9/7/16 | 59 | 63% | 36% | 2% |
| 9/8/16 | 77 | 75% | 25% | 0% |
| 9/9/16 | 64 | 81% | 0% | 19% |
| 9/10/16 | 2 | 0% | 0% | 100% |
| 9/11/16 | 1 | 0% | 100% | 0% |
| 9/12/16 | 54 | 72% | 28% | 0% |

| OVERALL | Number of Complaints | Percentage of Complaints |
|---|---|---|
| Same Day ("SD) | 2747 | 66% |
| 1 Day Delay ("1D") | 1029 | 25% |
| 2 or More Days' Delay ("2D+") | 371 | 9% |
| Total | 4147 | |

31. As shown above, on average, roughly one out of every three of the civil complaints reviewed were not made publicly available on the day they were filed, and the percentage of cases not made public was far greater on many days. For example, of the 90 new civil complaints filed on Thursday, February 11, 2016 that CNS sought to review, less than one-third were made public on that day. Since Friday, February 12, 2016 and Monday, February 15, 2016 were court holidays, the majority of the complaints filed that day were not made public until Tuesday, February 16, five days later, by which time these new cases were old news. The cases that were not made public until that Tuesday included an effort to enforce a $183 million judgment against a former director of ChinaCast Education Corporation, a contract dispute between Sotheby's and an Indian auction

291020.7\0549626

house, two class actions, and a shareholder derivative complaint involving global brand management company Iconix Brand Group.

32.     Likewise, on April 28, 2016, only 26 out of 61 e-filed complaints CNS sought to review—less than half—were available on the day of filing.  This meant CNS could not provide the public with information about, among other newsworthy actions, a negligence suit stemming from a helicopter landing in the Hudson River and an employment discrimination suit against the nationwide marketing firm TEAM Enterprises, until the following day.

**D.      Harm Caused by Deprivations of Timely Access**

33.     The New York County Clerk's policy and practice of withholding complaints from the public until after clerical processing means that often the public does not know that a person or entity is being hailed into the courts, because the action is hidden from view, often for days.  And even if the press or public somehow find out a new action has been filed, there is no way for them to learn about the factual allegations or legal claims without seeing the actual complaint.

34.     The Clerk's policy and practice of making complaints public only after they are processed means that CNS cannot inform its subscribers, and the public via its website, of newsworthy new civil actions at New York Supreme in a timely manner.  And when CNS reports on these actions on a delayed basis, CNS subscribers question why CNS is reporting on stale events, thus damaging the worth of its publications.

35.     The vacuum of information after a new complaint is filed but while it is being withheld from public view gives a plaintiff the power to control news about the new litigation.  The plaintiff is able to feed the news to a friendly publication and ensure prominent and favorable coverage.  Those news organizations that exercise diligence by attempting to review the flow of new actions at the courthouse and decide for themselves which ones are newsworthy are then scooped by

291020.7\0549626

the favored publication, reflecting negatively on competing media outlets.  Further, when only one news organization has access to new complaints, and the ability to report on those complaints in a timely manner, the public is deprived of the different viewpoints that come from competing coverage.

36.    In recent months, no fewer than three highly newsworthy cases filed toward the end of the day at New York Supreme were withheld for processing and not released to the public until the next day or later, but were reported on by another media outlet on the very day filed.  On information and belief, in all three instances, the plaintiffs and/or their counsel provided the complaint directly to the other media outlet.

37.    For example, on June 30, 2015, presidential candidate Donald Trump sued the Spanish language broadcast television network Univision over Univision's cancellation of Mr. Trump's beauty pageant contract based on his remarks about Mexicans.  The complaint, filed at 4:36 p.m. in New York Supreme, was national news almost immediately.

38.    Other journalists requested a copy of the complaint from CNS reporters, and CNS searched in vain on SCROLL.  CNS continued checking SCROLL for the rest of the afternoon and early evening and throughout the following morning, but the complaint was still not available from the Clerk's Office.  In fact, the Clerk withheld the complaint from the press and public until the afternoon of the following day (between 1:00 and 2:00 p.m. on July 1), a delay of almost 24 hours before the complaint became publicly available.

39.    Meanwhile, at 5:49 p.m. on June 30, the New York Post's Page Six online had published an article and attached a filed copy of the complaint, as shown by the Court's "received" stamp (but with no time stamp and no index number).  On information and belief, Page Six received

the complaint from the filing lawyer, who received a stamped copy of the filing from the Court, even though the complaint had not yet been processed, as indicated by the absence of an index number.

40.     Other recent examples of instances where the denial of timely access to complaints or summons with notice, in certain cases, filed in New York Supreme resulted in the filing party or attorney having a period of exclusive access in which to share a newsworthy filed complaint with a preferred media outlet, and CNS and other media being scooped as a result, are as follows:

a.     *Spitzer vs. Zakharova*, Index No. 155949/2016, filed July 15, 2016, at 4:30 p.m., but withheld by the Clerk's office until July 18 at 10:17 a.m.  By that time, the case was old news, having been reported in the *New York Times* online at 6:25 p.m. on July 15. The case brought by former New York Attorney General Eliot Spitzer claimed that a former Russian girlfriend was attempting to extort payment from him by accusing him of assault.

b.     *Tanatros vs. Fox News*, Index No. 157054-2016, filed August 22, 2016, at 6:04 p.m., but not released by the Clerk's office until August 23 at 10:13 a.m.  In the meantime, the case, brought by a former news host claiming that Fox News "operates like a sex-fueled, Playboy Mansion-like cult, steeped in intimidation, indecency, and misogyny," was reported in the *New York Times* online at 6:37 p.m. on August 22.

41.     Even in situations where CNS and other media are not scooped as a result of delays in access caused by the Clerk's practice of not allowing access until after processing, delays hurt news coverage of new civil actions filed at New York Supreme.  The newsworthiness of a new civil action declines with time.  Civil actions not reported on the day of filing are either not covered at all or receive less prominent coverage, and are thus less likely to grab the public's attention.

42.     Timely access upon receipt, as opposed to delayed access after processing, is also important to accuracy in news reporting.  Where access is withheld until after processing, news

-13-

about a new complaint sometimes becomes public, whether through press releases by the filing party or through some other means, but that news is prone to inaccuracies because the actual complaint cannot be reviewed through the Clerk's Office.

43.     The most efficient way to provide timely access to newly e-filed civil complaints is to provide electronic pre-processing access via computer terminals located at the courthouse and available to the press after court hours, or remotely online via the Internet (as the vast majority of federal District Courts and  a growing number of state courts do).  Other options exist as well. However, the method utilized is not key.  What is key is to provide the public and press access to newly filed complaints upon filing, without delay, consistent with the First Amendment.

## COUNT ONE

### Violation of U.S. Const. Amend. I and 42 U.S.C. §1983

44.     CNS incorporates and repeats the allegations of Paragraphs 1-43 herein.

45.     Defendant's actions under color of state law, including without limitation, his policy and practice of withholding newly filed civil complaints from public view until after processing, and the resulting denial of timely access to new civil complaints received for filing in New York Supreme, deprive CNS, and by extension its subscribers and the public, of their right of access to court records secured by the First Amendment to the U.S. Constitution.

46.     There is no compelling or overriding interest sufficient to justify Defendant's actions resulting in the denial of timely access to new complaints under the First Amendment.  Even if an overriding or compelling interest did exist, there are far less restrictive means of achieving any such interest, and Defendant's practices and policies are not narrowly tailored to serve that interest.

47.     CNS has no adequate remedy at law to prevent or redress Defendant's unconstitutional actions and will suffer irreparable harm as a result of Defendant's violation of its

-14-

First Amendment rights. CNS is therefore entitled to declaratory and both preliminary and permanent injunctive relief to prevent further deprivation of the First Amendment rights guaranteed to it and its subscribers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CNS seeks judgment against Defendant Milton Tingling, in his official capacity as County Clerk of New York County, as follows:

1.      For preliminary and permanent injunctions against Defendant, including his agents, assistants, successors, employees, and all persons acting in concert or cooperation with him, or at his direction or under his control, prohibiting him permanently from continuing his practices and policies resulting in delayed access to new civil complaints, including, *inter alia*, his practice of denying access to new complaints until after clerical processing and requiring him to provide timely access to newly filed civil complaints, as had been provided prior to electronic filing in New York Supreme.

2.      For a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Defendant's practices and policies that knowingly effect delays in access to newly filed civil complaints as unconstitutional under the First and Fourteenth Amendments to the United States Constitution, for the reason that that these practices and policies constitute an effective denial of access to court records.

3.      For an award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

4.      For all other relief the Court deems just and proper.

Date:   New York, New York
        November 10, 2016

291020.7\0549626

**BRYAN CAVE LLP**

By: _William Hibsher_

William Hibsher (SBN 1060326)
Jacquelyn Schell (SBN 5281837)
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile: (212) 541-4630

*Attorneys for Plaintiff Courthouse News Service*

291020.7\0549626