**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COURTHOUSE NEWS SERVICE,

                    Plaintiff,

             vs.

MILTON TINGLING, in his official capacity
as County Clerk of New York County, New
York,

                  Defendant.

Civil Action No.:  16-CIV-_____(   )

**DECLARATION OF ADAM ANGIONE**
**IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR A PRELIMINARY**
**INJUNCTION**

Adam Angione declares under penalty of perjury as follows:

1.      I am employed as the Northeast Bureau Chief for Courthouse News Service ("CNS"), the plaintiff in the above-captioned action.  I have personal knowledge of the following facts, except where otherwise stated, and could testify to the same if called as a witness.

2.      I graduated from the University of Cincinnati in December 2001 with a Bachelor of Arts in Communications.  During college, I worked as a student assistant for the University of Cincinnati Sports Information Office from roughly February 2000 through December 2001. After graduation, I held two internships in media relations, one with the Cincinnati Reds, and other with a minor league hockey team, the Cincinnati Cyclones, where I wrote articles for the team's website and assisted the promotions staff.

3.      CNS hired me as a reporter in 2004 to cover a number of state and federal courts in Ohio.  Since 2006, I have been tasked with monitoring various courts across the country as they transition from a paper-based environment to an electronic one—whether that transition involves a move to electronic filing ("e-filing"), an electronic case management system

("CMS"), or both.  As these transitions take place, particularly in courts where I supervise

reporters, my goal is to work with court officials to prevent the transition to e-filing or an

electronic CMS from eroding access to new complaints.  In 2007, CNS added the role of

Northeast Bureau Chief to my daily responsiblities.

4.      In my role as Northeast Bureau Chief, I supervise about 35 CNS reporters

covering state and federal courts in the Northeastern and Midwestern United States.  I also

personally visit many of the courts that I supervise in order to train reporters and stay up to date

on the various courts' access procedures.  For this reason, I have often observed CNS reporters'

and other journalists' procedures for reviewing and reporting on newly filed civil complaints,

and I can speak to the methods and timeliness with which access to newly filed complaints is

provided by various courts.

5.      As Northeast Bureau Chief, I also assign stories to reporters in my bureau who

cover a wide variety of political and legal topics.  Recent assignments in the Northeast Bureau

have included the first presidential debate of 2016 held at Hofstra University, ExxonMobil's

climate change denial in New York Supreme Court, a copyright dispute before the U.S. Court of

the Appeals for the Second Circuit regarding the 1960's "Iron Man" theme song, the FIFA

bribery scandal, the Tom Brady "Deflategate" trial, and other trial and appellate court pleadings

and rulings in state and federal court.

6.      CNS reporters across the country make regular courthouse visits in their assigned

area to report on civil lawsuits, and then publish that coverage in daily "New Litigation Reports,"

which are broken up by region or court.  In most large and mid-size cities, CNS' reporters visit

the courthouse on a daily basis to review newly filed actions.  However, when a court decides to

provide access to new complaints only via the internet, CNS typically reviews the flow of new

cases on the court's website every day and continues to make regular visits to the courthouse to monitor the files that are not posted online.

**Access to Civil Complaints at New York County Supreme Court**

7.      I have been the CNS Bureau Chief for the New York County Supreme Court in Manhattan ("New York Supreme") since June 2007.  I have visited the New York Supreme Courthouse dozens of times over the past nine years, and I have covered the court myself on many occasions when the regular CNS reporter has been on vacation or otherwise unavailable. In New York Supreme, as with other courts across the country, CNS focuses its New Litigation Report coverage on civil filings, primarily against businesses and public entities.   CNS does not cover, for example, matrimonial matters, estate disputes, or collection actions against individuals.

8.      The New York County Clerk's Office, located at 60 Centre Street in Foley Square, is open from 9:00 a.m. to 5:00 p.m., Monday through Friday.  CNS reporter Sarah Hull has covered New York Supreme since 2006.  Ms. Hull reviews newly filed civil complaints on a daily basis and summarizes the newsworthy actions for the "New York Supreme Report," one of CNS' New Litigation Reports, which is emailed to subscribers each evening, Monday through Friday.

9.      When I began overseeing the New York Supreme Report in 2007, new lawsuits could be only be filed in paper, and Ms. Hull reviewed the paper filings toward the end of each day in the "cage," an eight-by-eight foot former holding cell located in the basement of the courthouse, behind the Clerk's counter and among the shelves in the records room.  I, too, often reviewed newly-filed complaints in the "cage," when filling in for Ms. Hull during the paper-filing era of New York Supreme.

10.     At that time in the Clerk's Office, filers deposited new civil complaints with a cashier at an intake area adjacent to the records room.  The cashier, who was the first person to handle a complaint submitted to the court for filing, would receive complaints from filers, stamp the complaints with a file date and case number, and then immediately place them in a wire basket to the side.  Reporters were free to ask the cashier for the stack of complaints in the wire basket and review them in the cage over the course of the day.  The basket, and therefore the day's complaints, were available to the press until the last filing of the day was handed through the filing window.

11.     Because the press was able to retrieve newly filed cases from the intake basket upon receipt, 100% of newly filed civil complaints were available to the press essentially upon receipt on the same day they were filed.

12.     In addition to CNS, reporters from the *New York Daily News*, the *New York Post*, the *New York Sun*, Reuters, and Bloomberg reviewed each day's new complaints in the cage.  If we needed to see an older, fully processed filing that was already on the shelves, we could move freely among the shelves, behind the counter to find and pull the appropriate file ourselves.

13.     Although the front doors to the courthouse were locked at 5:00 p.m., members of the media working in the cage were allowed to remain after 5:00 p.m. and finish up their work. There was a side entrance where those of us in the cage could exit the building after the court closed to the public for the day.

14.     In around 2010, New York Supreme introduced voluntary e-filing for commercial and general civil complaints (while continuing to also accept paper-filed complaints until 2013). During this permissive e-filing period, the Clerk's office began scanning paper complaints.  The complaints were still stamped with a date and case number immediately upon filing, but at this

1955087.7\0549626

point, the media was no longer able to access paper filings directly from the cashier.  Instead, a

Clerk's office employee would gather the new complaints from the cashier's glass cube and take

them to another office to scan them.  As the new complaints were scanned, the hard copies were

placed on a desk near the records room until they were released to the press.

15.     The Clerk's Office would provide new paper filings to members of the press in

batches.  The first batch was delivered to the cage at approximately 3:45 p.m., and the second

batch shortly before 5:00 p.m.  If, for some reason, the clerk's staff did not deliver the

complaints to the cage, reporters were permitted to go to the staff members' work area, pick the

complaints up directly, and bring them back to the cage.

16.     As paper filings were scanned throughout the day, electronic versions of the

scanned complaints would appear on an intranet site made available on courthouse computer

terminals.  During this time, Ms. Hull would arrive at the courthouse each afternoon and review

the scanned complaints on computer terminals in the clerk's office, a process that typically lasted

until 3:45 p.m., at which time she would head to the "cage" to review the rest of the day's paper

complaints.  By continuing to review new paper complaints both in the cage as well as on

intranet computer terminals within the courthouse, Ms. Hull was still able to continue seeing

nearly all new paper-filed complaints on the same day they were filed.

17.     In 2012, the Clerk stopped releasing paper complaints to the media altogether, and

in 2013, e-filing for new civil actions became mandatory.  E-filed documents have only ever

been available to the press online, through the Supreme Court Records On-Line Library

("SCROLL") or the New York State Court E-Filing website ("NYSCEF"), where access to

complaints is identical, either at a courthouse computer terminal or remotely online, and only

after the Clerk's office has finished reviewing and processing them.  As a result of this change, press access to new complaints has been substantially delayed, as explained below.

**Substantial Delays Under Post-Processing Access**

18.     I tracked the delays in public access to newly filed civil complaints in New York Supreme over four time periods (totaling 82 days) over the past year (Nov. 12, 2015 – Nov. 20, 2015; Jan. 6, 2016 – Feb. 17, 2016; Apr. 13, 2016 – May 3, 2016; Aug. 29, 2016 – Sep. 12, 2016).

19.     What I have noticed while conducting the tracking logs is that cases filed later in the afternoon are rarely available, and those filed online after the courthouse closes at 5 p.m. are never available until the next day, at the earliest.  In both instances, the complaint is considered filed on the day it is received.  The procedure that New York Supreme has chosen—electronic filing of complaints and access through the SCROLL and NYSCEF websites—is a twenty-four hour, online system available both at the courthouse and off site.  Yet, the complaints themselves are withheld from both SCROLL and NYSCEF until the Clerk's Office re-opens the next court day, because the Clerk insists on "reviewing" newly filed complaints before they are released to the public.  This is regardless of the fact that the date and time of filing for statute of limitations purposes is set at the time of receipt by the Court, not the assignment of an index number or after processing.

20.     Overall, only 66% of complaints that were e-filed during those periods were made available to the public and press on the day of filing, substantially fewer than the 100% same-day availability in the paper-filing era, where access was not conditioned on clerk "review."

21.     There have been several days when access to newly e-filed complaints dips below 60% and a handful of days where access was even worse.  For example, on April 28, 2016, of the

61 cases filed, only 26 of them—43%—were available on the day of filing, while the rest were

not posted to the SCROLL or NYSCEF websites until the following day.  Because of the delays

in processing those 35 cases, access to newsworthy filings like a negligence claim stemming

from a helicopter landing in the Hudson River and an employment discrimination suit against the

nationwide marketing firm, TEAM Enterprises, was postponed and coverage was not possible

until the following day's news cycle.

22.     When plaintiffs electronically file new actions towards the end of the day or just

before a weekend or holiday, public access is delayed until at least the following business day,

which could add up to four or five calendar days over a holiday weekend.  This is true even

though the filers receive credit (for purposes of statute of limitations and other deadlines) for the

actual, pre-weekend filing date.

23.     This scenario happened in February 2016 when New York Supreme observed

both Lincoln's Birthday and President's Day on either end of the same weekend.  On February

11, the Thursday before the Lincoln's Birthday, only 27 of the 90 new complaints filed—30%—

were available that day, and over the course of the holiday weekend (Friday February 12 through

Monday, February 15) not a single additional case was posted to the SCROLL or NYSCEF

website—not the remaining 70% of Thursday's filings nor any additional complaints filed

between Friday and Monday.  Altogether, 156 cases were e-filed over the course of five days,

and none were available to the public until the following Tuesday, February 16.  These 156 cases

included important matters such as an effort to enforce a $183 million judgment against a former

director of ChinaCast Education Corporation, a contract dispute between Sotheby's and an

Indian auction house, two class actions, and a shareholder derivative complaint involving global

brand management company Iconix Brand Group.

24.     The access data for periods in November 2015 and January, February, April, May, August and September 2016 is provided in the chart below.  In the chart, the "#" column reflects the number of complaints that were filed on any given day.  The "SD" column indicates the percentage of those complaints CNS was able to view the same day they were filed. The "1D" column reflects the percentage of those cases available the following day, and the "2D+" column reflects the percentage of those cases withheld for two or more days after filing:

| DATE | # Compl. Reviewed | SD | 1D | 2D+ | DATE | # Compl. Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|---|---|---|---|---|
| 11/12/15 | 51 | 65% | 35% | 0% | 2/1/16 | 77 | 53% | 47% | 0% |
| 11/13/15 | 84 | 80% | 0% | 20% | 2/2/16 | 71 | 61% | 37% | 3% |
| 11/14/15 | 4 | 0% | 0% | 100% | 2/3/16 | 76 | 79% | 21% | 0% |
| 11/15/15 | 2 | 0% | 100% | 0% | 2/4/16 | 77 | 66% | 34% | 0% |
| 11/16/15 | 89 | 76% | 24% | 0% | 2/5/16 | 38 | 61% | 0% | 39% |
| 11/17/15 | 56 | 82% | 18% | 0% | 2/6/16 | 2 | 0% | 0% | 100% |
| 11/18/15 | 75 | 76% | 24% | 0% | 2/7/16 | 3 | 0% | 100% | 0% |
| 11/19/15 | 75 | 84% | 16% | 0% | 2/8/16 | 61 | 59% | 41% | 0% |
| 11/20/15 | 62 | 89% | 0% | 11% | 2/9/16 | 73 | 68% | 32% | 0% |
| 1/6/16 | 57 | 74% | 26% | 0% | 2/10/16 | 71 | 79% | 21% | 0% |
| 1/7/16 | 54 | 63% | 37% | 0% | 2/11/16 | 90 | 30% | 0% | 70% |
| 1/11/16 | 61 | 74% | 26% | 0% | 2/12/16 | 64 | 0% | 0% | 100% |
| 1/12/16 | 65 | 58% | 42% | 0% | 2/13/16 | 4 | 0% | 0% | 100% |
| 1/13/16 | 67 | 78% | 22% | 0% | 2/14/16 | 3 | 0% | 0% | 100% |
| 1/14/16 | 66 | 74% | 24% | 2% | 2/15/16 | 22 | 0% | 95% | 5% |
| 1/15/16 | 64 | 64% | 0% | 36% | 2/16/16 | 83 | 66% | 34% | 0% |
| 1/17/16 | 2 | 0% | 0% | 100% | 2/17/16 | 5 | 100% | 0% | 0% |
| 1/18/16 | 35 | 0% | 100% | 0% | 4/13/16 | 69 | 68% | 32% | 0% |
| 1/19/16 | 67 | 69% | 31% | 0% | 4/14/16 | 87 | 64% | 36% | 0% |
| 1/20/16 | 68 | 60% | 40% | 0% | 4/15/16 | 64 | 67% | 0% | 33% |
| 1/21/16 | 90 | 73% | 27% | 0% | 4/16/16 | 1 | 0% | 0% | 100% |
| 1/22/16 | 69 | 83% | 0% | 17% | 4/18/16 | 83 | 86% | 13% | 1% |
| 1/23/16 | 2 | 0% | 0% | 100% | 4/19/16 | 63 | 75% | 24% | 2% |
| 1/24/16 | 4 | 25% | 75% | 0% | 4/20/16 | 58 | 60% | 38% | 2% |
| 1/25/16 | 49 | 67% | 33% | 0% | 4/21/16 | 54 | 85% | 15% | 0% |
| 1/26/16 | 65 | 80% | 20% | 0% | 4/22/16 | 73 | 56% | 0% | 44% |
| 1/27/16 | 67 | 67% | 30% | 3% | 4/23/16 | 2 | 0% | 0% | 100% |
| 1/28/16 | 56 | 79% | 20% | 2% | 4/24/16 | 3 | 0% | 100% | 0% |
| 1/29/16 | 67 | 64% | 0% | 36% | 4/25/16 | 52 | 79% | 19% | 2% |
| 1/30/16 | 4 | 0% | 0% | 100% | 4/26/16 | 76 | 33% | 67% | 0% |
| 1/31/16 | 1 | 0% | 100% | 0% | 4/27/16 | 66 | 76% | 21% | 3% |

1955087.7\0549626

| DATE | # Compl. Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|
| 4/28/16 | 61 | 43% | 57% | 0% |
| 4/29/16 | 69 | 65% | 0% | 35% |
| 4/30/16 | 3 | 0% | 0% | 100% |
| 5/1/16 | 3 | 0% | 100% | 0% |
| 5/2/16 | 64 | 61% | 39% | 0% |
| 5/3/16 | 74 | 82% | 18% | 0% |
| 8/29/16 | 67 | 70% | 28% | 1% |
| 8/30/16 | 75 | 63% | 35% | 3% |
| 8/31/16 | 116 | 51% | 48% | 1% |
| 9/1/16 | 101 | 87% | 13% | 0% |

| DATE | # Compl. Reviewed | SD | 1D | 2D+ |
|---|---|---|---|---|
| 9/2/16 | 50 | 84% | 0% | 16% |
| 9/4/16 | 1 | 0% | 0% | 100% |
| 9/5/16 | 2 | 0% | 50% | 50% |
| 9/6/16 | 55 | 73% | 27% | 0% |
| 9/7/16 | 59 | 63% | 36% | 2% |
| 9/8/16 | 77 | 75% | 25% | 0% |
| 9/9/16 | 64 | 81% | 0% | 19% |
| 9/10/16 | 2 | 0% | 0% | 100% |
| 9/11/16 | 1 | 0% | 100% | 0% |
| 9/12/16 | 54 | 72% | 28% | 0% |

| OVERALL | Number of Complaints | Percentage of Complaints |
|---|---|---|
| Same Day ("SD) | 2747 | 66% |
| 1 Day Delay ("1D") | 1029 | 25% |
| 2 or More Days' Delay ("2D+") | 371 | 9% |
| Total | 4147 | |

**Federal Courts Provide Access Before Processing**

25.     The vast majority of federal District Courts, including this District and the other three District Courts in New York State, provide access to newly-filed complaints upon filing, without clerk processing, 24 hours a day, seven days a week.  The result is that reporters have access upon receipt to complaints filed in all four federal District Courts in New York, on par with the pre-processing access available to the media during the paper-filing era in most federal courts.

SDNY

26.     The Southern District of New York adopted mandatory e-filing in June 2015. CNS' reporter visits the Daniel Patrick Moynihan United States Courthouse in lower Manhattan on a daily basis.  There are two computer terminals located in the press room at the courthouse that provide PACER access (the exact same access as online PACER) free of charge for

reporters.  There are additional PACER terminals in several different locations throughout the courthouse as well.  New complaints flow onto PACER as soon as they are received for filing in the Southern District of New York, without any clerk review, and new complaints are available on PACER long after the court has closed for business on weekdays as well as weekends.

EDNY

27.     E-filing for new complaints has been in place in the Eastern District since 2014 but is not mandatory, and complaints continue to be filed in paper at the Theodore Roosevelt United States Courthouse.  The Eastern District provides prompt, pre-processing access to both paper- and e-filed complaints, through a dual system of access.

28.     When a new complaint is filed in paper, the filer must also present a press copy that is stamped with a case number and immediately placed into a wooden press box behind the counter in the clerk's office.  Any member of the press can request to see the new filings in the press box any time of day, and the assisting clerk will hand over the stack of newly filed complaints.  The reporter then takes the stack of complaints to the press room.  After that reporter is finished reviewing them, the complaints are shared with other members of the in-house press, and then placed in a stack in the press room until they are discarded.

29.     New e-filed complaints are automatically assigned a case number by the court's CM/ECF system and automatically made available on PACER upon receipt by the court, without any clerk review.  Reporters can either review the e-filings for free at one of four courthouse computer terminals located in the clerk's office or remotely on PACER for a fee; either way, access is immediate.

1955087.7\0549626

NDNY

30.     All new complaints in the Northern District must be filed under a "shell" case

number that has been provided by the court, so members of the press can review new filings

immediately upon submission, prior to any "processing" required to accept or index the

document into the court's docket.

31.     The shell case number is the same for all new filings, so that members of the press

can simply search that number and review all new filings.  This is effectively the same as

providing a traditional media basket at the intake counter, because the new complaints flow

automatically into the register of actions without any clerk review.  Thereafter, clerks enter

docket information, create a new permanent case number and attach a PDF of the complaint

which filing attorneys have uploaded.

32.     Oftentimes a new complaint appears in the electronic in-box without a permanent

case number or judge assignment in the docket text.  In that instance, CNS uses a temporary case

number for publication in the daily report and then updates its database with the permanent case

number and judge when they are assigned.  If a new civil complaint that appears in the electronic

in-box has already been assigned a permanent case number and judge, that complaint will still

appear in the press queue for the rest of the day, but it will also be searchable on PACER by its

permanent case number.  When a permanent case number and judge are displayed in the press-

queue docket text, CNS' reporters include that information in the published report.

WDNY

33.     E-filing for new complaints has been mandatory in Western District since 2004.

New complaints are assigned a case number immediately upon submission and pushed directly

to PACER, without any clerk processing, acceptance, or other review.  Because of this policy in

the Western District, CNS is able to view all new complaints other than those filed under seal as soon as they are received for filing.

34.     While access to documents filed with the Western District is available free of charge at computer terminals inside the courthouses in Buffalo and Rochester, CNS' coverage of the court has mostly been conducted remotely on PACER.  Either way, access to newly filed complaints is available immediately upon filing.

**Efforts To Amicably Resolve Delays**

35.     As part of the attempts to achieve an amiable resolution to the access issues at New York Supreme (described more fully in the Declaration of William Girdner), I participated in two in-person meetings with New York County Clerk Milton Tingling and his colleagues.

36.     The first, on February 18, 2016, included Defendant Tingling, his Deputy Clerk, and CNS' counsel.

37.     The second meeting, on September 15, 2016, in addition to me included counsel for CNS; Ronald Younkins, Executive Director of the New York Office of Court Administration ("OCA"); Defendant Tingling; Richmond County Clerk, Stephen Fiala; OCA General Counsel, John McConnell, and Barry Clarke.

38.     In both meetings, CNS presented its concerns about the access to new court filings provided by New York Supreme, and Defendant Tingling (and other court officials, in the second meeting) discussed their reasons for the existing policy and reluctance to change.  Both meetings also discussed examples from other jurisdictions and various means of providing prompt, pre-processing access with as little cost or work as possible required.

39.     Over the course of two meetings, Defendant Tingling did not dispute CNS' data detailing the substantial delays in access and instead took the following positions:  First, he

1955087.7\0549626

stated that until processing is complete and an index number is affixed, the new complaint is not

an "official filing" and can be held in confidence by the Court. Defendant also said that although

providing access to newly-filed civil complaints prior to processing via the court's web site

would be feasible with some "tweaking," which I took to mean software changes, such

documents were not "official" court records and therefore not public until after his office

"reviewed" and processed the complaints. Defendant further stated that "review" included

confirmation that the filing was made in the correct category (*e.g.*, civil, matrimonial, mental

hygiene), making sure that certain private information was redacted, and, as a last step, affixing

an index number. Defendant added that he had only one person in his indexing department and

his budget might be cut even further, which contributed to the delays in access CNS had been

experiencing.

40.     Repeatedly at these meetings, Defendant Tingling and at least one of his

colleagues stated that clerks were required, or "mandated," to review complaints prior to

releasing them to the public, though no one identified any statute or rule on which they based this

assertion. I recall Defendant saying that the matter of press access came down to the question of

when a court document becomes a public record. On that question, his position was that the

clerk's office should not provide access before a document is reviewed and becomes an

"official" document. And no mention was made at the meeting of the proposed rule that was

issued the next day requiring clerks to redact social security numbers from court filings.


*[signature on following page]*

-14-

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct to the best of my knowledge.

ADAM ANGIONE

Dated:   November 10, 2016
         New York, New York