**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COURTHOUSE NEWS SERVICE,

                    Plaintiff,

          vs.                                   **Civil Action No.:  1:16-cv-08742-ER**

MILTON TINGLING, in his official capacity
as County Clerk of New York County, New
York,

                    Defendant.


**PLAINTIFF COURTHOUSE NEWS SERVICE'S MEMORANDUM IN SUPPORT OF**
**ITS MOTION FOR A PRELIMINARY INJUNCTION**


**BRYAN CAVE LLP**
1290 Avenue of the Americas
New York, New York 10104-3300
(212) 541-2000

*Attorneys for Plaintiff Courthouse News*
*Service*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 3

    A.    About CNS...............................................................................................3

    B.    A Tradition Of Timely Access On Receipt............................................4

    C.    Current Delays In Access To New York Supreme Civil Complaints......................6

    D.    Efforts To Resolve Access Problems Without Litigation.......................8

ARGUMENT ..................................................................................................... 10

A PRELIMINARY INJUNCTION IS NECESSARY TO CURTAIL DEFENDANT'S UNLAWFUL DEPRIVATION OF CNS' FIRST AMENDMENT RIGHT OF ACCESS TO NEWLY FILED CIVIL COMPLAINTS ..................................................................... 10

    A.    CNS Is Likely To Succeed On The Merits Because Delays In Access Are Denials Of Access, And Defendant Cannot Meet His Burden To Justify The Delays ...........................................................................................11

        1.    The First Amendment Creates A Presumptive Right Of Access To Civil Complaints As Soon As They Are Received For Filing..................12

            a.    *New York Supreme Complaints Are Filed On Receipt* .................14

            b.    *Even Short Delays Implicate First Amendment Rights*..................16

        2.    Defendant's Policies And Resulting Delays Do Not Satisfy Constitutional Requirements For Withholding Judicial Records .............17

    B.    CNS, Its Subscribers, And The Public Will Be Irreparably Harmed Without Injunctive Relief...............................................................................20

    C.    The Balance Of Equities Tips In Favor Of CNS ...................................21

    D.    Injunctive Relief Would Serve The Public Interest .............................21

    E.    Bond Should Be Waived Or Set At A Nominal Amount ......................23

CONCLUSION.................................................................................................. 23

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Associated Press v. U.S. Dist. Ct.*,
    705 F.2d 1143 (9th Cir. 1983) ............................................................. 16

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
    2016 WL 1071107 (S.D.N.Y. Mar. 18, 2016) ................................... 13-15

*Bernstein v. Bernstein, Litowiz Berger & Grossman LLP*,
    814 F.3d 132 (2d Cir. 2016) ......................................................... *passim*

*Bery v. City of N.Y.*,
    97 F.3d 689 (2d Cir. 1996) ................................................................. 20

*Campbell v. New York Evening Post,Inc.*,
    245 N.Y. 320 (1927) .......................................................................... 15

*Charette v. Town of Oyster Bay*,
    159 F.3d 749 (2d Cir. 1998) ............................................................... 20

*Chicago Council of Lawyers v. Bauer*,
    522 F.2d 242 (7th Cir. 1975) .............................................................. 16

*Courthouse News Serv. v. Jackson*,
    2009 WL 2163609 (S.D. Tex. July 20, 2009) ................................ *passim*

*Courthouse News Serv. v. Planet*,
    2016 WL 4157210 (C.D. Cal. May 26, 2016) ..................... 13, 14, 17, 18

*Courthouse News Serv. v. Planet*,
    2016 WL 4157354 (C.D. Cal. June 14, 2016) ...................................... 13

*Courthouse News Serv. v. Planet*,
    750 F.3d 776 (9th Cir. 2014) ......................................................... 13, 20

*Cox Broad. Corp. v. Cohen*,
    420 U.S. 469 (1975) .......................................................................... 22

*Doe v. Public Citizen*,
    749 F.3d 246 (4th Cir. 2014) .............................................................. 16

*Doninger v. Niehoff*,
    527 F.3d 41 (2d Cir. 2008) ................................................................. 20

291712.4

*Donohue v. Mangano,*
  886 F. Supp. 2d 126 (E.D.N.Y. 2012) ............................................... 23

*Elrod v. Burns,*
  427 U.S. 347 (1976) ........................................................................... 20

*Fed. Trade Comm'n v. AbbVie Prods. LLC,*
  713 F.3d 54 (11th Cir. 2013) ............................................................. 13

*Globe Newspaper Co. v. Pokaski,*
  868 F.2d 497 (1st Cir. 1989) .............................................................. 16

*Globe Newspaper Co. v. Superior Court,*
  457 U.S. 596 (1982) ........................................................................... 12

*Grove Fresh Distribs. Inc. v. Everfresh Juice Co.,*
  24 F.3d 893 (7th Cir. 1994) ..................................................... 2, 16, 17

*In re Charlotte Observer (Div. of Knight Pub. Co.),*
  882 F.2d 850 (4th Cir. 1989) ............................................................. 17

*In re Eastman Kodak Cos. Application,*
  2010 WL 2490982 (S.D.N.Y. June 15, 2010) ................................... 13

*In re New York Times Co.,*
  828 F.2d 110 (2d Cir. 1987) .............................................................. 18

*Johnson v. Goord,*
  288 A.D.2d 811 (3d Dep't 2001) ....................................................... 15

*Kermani v. N.Y. State Bd. of, Elecs.,*
  487 F. Supp. 2d 101 (N.D.N.Y. 2006) .............................................. 23

*Lugosch v. Pyramid Co. of Onondaga,*
  435 F.3d 110 (2d Cir. 2006) ....................................................... *passim*

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
  598 F.3d 30 (2d Cir. 2010) ................................................................ 10

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976) ..................................................................... 17, 24

*New York Civil Liberties Union v. New York City Transit Auth.,*
  684 F.3d 286 (2d Cir. 2012) ........................................................ 12, 18

291712.4

*Pamlab, L.L.C. v. Macoven Pharms., L.L.C.*,
  881 F. Supp. 2d 470 (S.D.N.Y. 2012)...................................................................... 20

*Press-Enterprise Co. v. Superior Court*,
  464 U.S. 501 (1984)......................................................................................... 12

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986)........................................................................................... 12

*Reeves v. American Broad. Cos.*,
  719 F.2d 602 (2d Cir. 1983)............................................................................. 22

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)............................................................................. 21

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990)............................................................................. 21

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980)..................................................................................... 1, 12

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)............................................................................... 20

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)........................................................................................... 10

## OTHER AUTHORITIES

FED. R. CIV. P. 5.2 ................................................................................................ 18

N.Y. C.P.L.R. § 304(c) (McKinney 2010)............................................................. 15

22 N.Y.C.R.R. § 202.5(b)(1) (2003) ..................................................................... 10

22 N.Y.C.R.R. § 202.5(e) (2003) .......................................................................... 18

291712.4

Plaintiff Courthouse News Service ("CNS") submits this Memorandum of Law in Support of its Motion for a Preliminary Injunction against Defendant Milton Tingling in his official capacity as County Clerk of New York County ("Defendant" or "Clerk"). CNS asks the Court to enjoin Defendant's practices and policies resulting in delayed access to newly-filed civil complaints, including, *inter alia*, his practice of denying access until after clerical processing, and require Defendant provide CNS access in a timely manner upon receipt, as required by the First Amendment.

## PRELIMINARY STATEMENT

The New York State Supreme Court, County of New York ("New York Supreme"), is one of the most important courts in our land. Important and high-stakes civil contests affecting the lives of many people, beyond the named parties, are regularly filed there and are frequently matters of great media and public interest. Consistent with this, reporters from a variety of news outlets, including CNS, who traditionally visited the Clerk's counter at New York Supreme on a daily basis to review the day's new civil complaints, had access to those complaints upon receipt by the court and irrespective of whether the clerical processing associated with the Clerk's intake of those complaints had been completed. As a result, the press had access to 100% of the new complaints filed on any given day. This, in turn, enabled them to report on newsworthy new civil actions filed at New York Supreme in a timely manner, fulfilling their role as "surrogates for the public" who acquire information about their courts "chiefly through the print and electronic media." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).

With the advent of mandatory electronic filing ("e-filing") in 2013, however, the Clerk's office began withholding access to new complaints until after processing. Defendant takes the position that a complaint received for filing is not an "official" court record (and therefore not

public) until after his office has completed clerical processing, a series of administrative tasks concluding with the assignment of an index number. The result is that, on average, nearly one in three newly filed complaints is withheld from review by interested members of the public and the press until the court day after the complaint is filed, which results in actual delays of three, four, or even five days with intervening weekends and/or holidays. And on some days, an even greater percentage of new complaints is not made public.

These denials of access, while temporary, lead to less accurate and less balanced reporting about fundamentally public proceedings and to a decreased likelihood that those proceedings ever come to the public's attention, all in violation of the First Amendment to the U.S. Constitution. The Second Circuit has expressly ruled that the First Amendment provides a presumptive right of access to civil complaints, *Bernstein v. Bernstein, Litowitz Berger & Grossman LLP*, 814 F.3d 132, 140-41 (2d Cir. 2016) ("*Bernstein*"), and the Second Circuit's public access cases and similar cases in other circuits "emphasize the importance of immediate access where a right to access is found." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006) ("*Lugosch*"). "'The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression.'" *Id*. at 127 (*quoting Grove Fresh Distribs. Inc. v. Everfresh Juice Co*., 24 F.3d 893, 897 (7th Cir. 1994)).

Having failed in its considerable efforts over the past year to work cooperatively with Defendant to resolve this matter, CNS now seeks a preliminary injunction requiring that Defendant return to the decades-long tradition of timely access to New York Supreme civil complaints on receipt and before processing while the Court considers the validity of Defendant's practices and policies.

**A.** **About CNS**

CNS is a nationwide news service that reports on the civil court record, from the initial pleading though judgment and appeal. (Declaration of William Girdner ("Girdner Dec.") ¶¶ 1, 7-9.) Its more than 2,700 subscribers include lawyers, law firms, law schools, and law libraries, among others. (*Id*. at ¶¶ 11-12.) All but a very few of the nation's large and mid-sized law firms subscribe to one or more of CNS' publications, and more than 200 of CNS' subscribers have one or more offices in New York City. (*Id*. at ¶ 13.) Many other media organizations also subscribe to CNS, from *The Los Angeles Times* in the West to *The Wall Street Journal* in New York, putting CNS in the position of a nationwide pool reporter. (*Id*. at ¶ 10.)

CNS offers a variety of publications. (*Id*. at ¶ 7.) Its new Litigation Reports feature original, staff-written reports of newsworthy new civil complaints within a particular jurisdiction that are e-mailed to subscribers nightly. (*Id*.) Although not all new complaints are significant enough to be included, the new litigation reports cover many more complaints than do the daily newspapers. (*Id*. at ¶ 7.) CNS' web site (www.courthousenews.com), which does not require a subscription, is updated daily with staff-written articles and columns and averages about one million readers per month.[1] (*Id*. at ¶ 9.) CNS' reporting has been credited as the original source

---

[1] For example, on October 24, 2016, the CNS website featured articles on testimony in the "Bridgegate" trial in the District of New Jersey; a five hour sentencing hearing for former Pennsylvania Attorney General Kathleen Kane; a suit by gun owners in Putnam County, New York against Gannett-owned *The Journal News* to prevent publication of permit holders' names in that county; a campaign rally by Hillary Clinton and a tweet by Donald Trump telling his supporter to ignore the polls; Sen. Patrick Leahy's call for Judiciary Committee hearings on the AT&T merger with Time Warner; a dispute over a pre-trial document dump in the southern California class action by former Trump University students; a pair of California referendums on the sale of plastic bags; the apparent victory of Berkeley in the government's forfeiture case against a marijuana dispensary that has paid hundreds of thousands of dollars in taxes to the City; and the listing of the gulf grouper as an endangered species. (Girdner Dec. ¶ 9.)

for stories by a wide range of news outlets, including daily newspapers (*e.g.*, *The New York Times*, *The Wall Street Journal*, and *New York Daily News*); magazines (*e.g.*, *New York Magazine*, *Forbes*, *U.S. News and World Report*); television news (*e.g.*, ABC News, Fox News); online-only publications (*e.g.*, The Daily Beast, Politico); and radio (*e.g.*, NPR). (*Id.* at ¶ 10.)

Nationwide, CNS employs more than 300 people, most of them reporters, across almost all of the 50 states. (*Id.* at ¶ 6.) In New York, CNS employs 14 people, including Bureau Chief Adam Angione, whose declaration is attached ("Angione Dec."), a web editor, and 12 reporters who cover the state and federal trial and appellate courts of New York. (*Id.*)

**B.       A Tradition Of Timely Access On Receipt**

Since at least as early as 1997, and prior to the introduction of e-filing in 2013, the New York press corps, including CNS, reviewed newly filed New York Supreme complaints before clerical processing (also referred to as "docketing") had been completed. (*Id.* at ¶¶ 3-4.) After being received by a cashier and stamped with a file date and index number, new complaints would be immediately placed in a basket in the intake area, which reporters had access to throughout the day. (Angione Dec. ¶ 10; Girdner Dec. ¶ 10.) This enabled reporters to review and report on 100% of the new civil complaints received on any given day. (Angione Dec. ¶ 11; Girdner Dec. ¶ 18.) Only after the press reviewed the new complaints did clerks continue processing and place complaints into file folders in the records room. (Angione Dec. ¶ 10.) This traditional access to civil complaints before clerical processing at New York Supreme was consistent with practices followed by other major state and federal courts. (Girdner Dec. ¶ 3.)

With the introduction of mandatory e-filing in 2013, however, the Clerk's office began withholding newly filed complaints from press review until after processing. (Angione Dec. ¶ 17; Girdner Dec. ¶ 20.) The only way Defendant allows the press to see new complaints now is

online, through the Supreme Court Records On-Line Library ("SCROLL") or the New York

State Court E-Filing website ("NYSCESF"), either at a courthouse computer terminal or

remotely, and only after the Clerk's office has finished its clerical processing and assigned an

index number. [2] (Angione Dec. ¶ 17.)  Despite the long tradition of press access to new

complaints on a pre-processing basis at New York Supreme, Defendant has taken the position

that new e-filed complaints are not "officially filed" and should be withheld from the press or

public until after the completion of clerical processing, which at his office consists of a series of

administrative tasks ending with the assignment of an index number (which now takes place at

the end of processing).  (Angione Dec. ¶ 39; Girdner Dec. ¶ 50.)  The result is that on any given

day, a substantial percentage of the new civil complaints are withheld from the press and, by

extension, the public.  (Angione Dec. ¶¶ 19-21; Girdner Dec. ¶ 23.)  Defendant takes this

position even though the date and time of the complaint's receipt by the Clerk is the date and

time the complaint is considered filed, and even though existing rules of court put an affirmative

obligation on filing parties to omit or redact confidential personal information in papers

submitted for filing.  (Angione Dec. ¶ 19.)

 Defendant's refusal to provide access to complaints until after clerical processing is not a

necessary byproduct of e-filing.  To the contrary, the majority of federal district courts, including

all four in New York, continue to provide traditional access to complaints before processing even

in the e-filing environment.  (Angione Dec. ¶ 25.)  Among these federal district courts, the

largest group, which includes the Southern, Western, and Eastern Districts of New York,

automatically assign a permanent case number upon receipt of a new civil action and

---

[2] While these are different web sites, each with a slightly different interface, access to new
complaints provided through them is identical both in terms of documents provided and
timeliness of access.  (Angione Dec. ¶ 17.)

immediately make those complaints available for viewing online via PACER, even when the courts are closed. (*Id*. at ¶¶ 29, 33.)  Other federal district courts follow different procedures but achieve the same result, such as by assigning a temporary number and allowing press review of the new complaints through those temporary numbers, also upon receipt and even when courts are closed.[3]   (*See* Angione Dec. ¶¶ 25-34 (comparing various courts); Girdner Dec. ¶ 38.)

The federal courts are not alone in providing timely access to e-filed complaints on receipt and prior to processing.  State courts in Alabama, Connecticut, Georgia, Nevada, and Utah also provide such access to e-filed complaints.  (Girdner Dec. ¶ 40.)  As is the case with federal district courts, there are variations among state courts in how they provide that access, but the variations themselves demonstrate that providing timely access in the e-filing environment is not a matter of technology, but of policy. (*Id.*)

**C.      Current Delays In Access To New York Supreme Civil Complaints**

The percentage of new civil complaints withheld as a result of Defendant's policy varies from day to day.  In recent months, on average, one out of every three complaints CNS sought to review was not available until the next court day, and often carried over two to three calendar days.  (Angione Dec. ¶ 24.)  Some days are even worse; it is not uncommon for the press, including CNS, to be denied access to roughly 40% or 50% of the new complaints filed on any given day.  (Angione Dec. ¶¶ 18-24; Girdner Dec. ¶ 21.)  And a denial of access for even one court day means actual delays of two, three, four, or even five days where there is an intervening weekend or holiday.  (Angione Dec. ¶ 22; Girdner Dec. ¶ 21.)  For example, of the 90 complaints filed on Thursday, February 11, 2016, that CNS' reporter sought to review, more than two-thirds

---

[3] The minority of federal courts that do not provide electronic access on receipt nevertheless have found ways to provide timely access to e-filed complaints, before processing.  For example, the District of Alabama prints out complaints upon electronic receipt and makes them available to the press prior to further processing.  (Girdner Dec. ¶ 39.)

291712.4

were withheld from public view.  (Angione Dec. ¶ 23.)  And since Friday, February 12 was a

court holiday (Lincoln's Birthday), as was Monday, February 15 (President's Day), the press,

and by extension the public, was kept in the dark about these new civil actions until Tuesday,

February 16 – five days later.  (*Id.* at ¶ 23.)

Even where there is not an intervening weekend or holiday, Defendant's policy has a

material impact on news reporting, including allowing plaintiffs to manipulate news coverage

about complaints that are withheld from public view, especially given that the most important

complaints tend to be filed late in the day.  (Girdner Dec. ¶¶ 23-28.)   For example, at 4:36 p.m.

on June 30, 2015, then presidential candidate Donald Trump sued Univision over its cancellation

of the candidate's beauty pageant contract based on his remarks about Mexicans.  (*Id.* at ¶ 29.)

But for Defendant's practice and policy of withholding complaints until after clerical processing,

all members of the media, including CNS, would have had an opportunity to review that action

upon its receipt by the Clerk's office and report on it in a timely manner.  (*See id.* at ¶¶ 3-4, 17-

20 (describing change in access after change in policy).)  But Defendant did not make the

complaint public until early afternoon the next day, a delay of almost 24 hours.  (*Id.* at ¶ 32.)

Meanwhile, by 5:49 p.m. on June 30, the New York Post's online Page Six had already reported

on the complaint, which that publication no doubt received from Trump's attorneys, as

evidenced by the filed copy of the complaint accompanying the news report, which bore the

court's "received" stamp but did not have a time stamp or index number.  (*Id*. at ¶ 31.)

This is not the only instance in which Defendant's policies and procedures, and the

resulting periods in which complaints are not made public, allow the filing parties to have a

period of exclusive access in which to share a newsworthy filed complaint with a preferred

media outlet, thus depriving the public of contemporaneous news coverage from other competing

news outlets and harming the competing news entities. (*Id.* at ¶ 33.) For example, *Spitzer vs. Zakharova*, in which former New York Attorney General Eliot Spitzer accused a former Russian girlfriend of attempting to extort payment from him by accusing him of assault, was filed July 15, 2016, at 4:30 p.m., but withheld by the Clerk's office until July 18 at 10:17 a.m. By that time, the case was old news, having been reported in the New York Times online at 6:25 p.m. on July 15. Similarly, *Tanatros vs. Fox News*, filed August 22, 2016, at 6:04 p.m., was not released by the Clerk's office until August 23 at 10:13 a.m. (*Id.*) In the meantime, the case – brought by a former news host claiming that Fox News "operates like a sex-fueled, Playboy Mansion-like cult, steeped in intimidation, indecency, and misogyny" – was reported in the New York Times online at 6:37 p.m. on August 22. (*Id.*)

D.    **Efforts To Resolve Access Problems Without Litigation**

In an effort to address the problems at New York Supreme cooperatively and without litigation, Mr. Girdner, CNS' Editor and Publisher, wrote Defendant in July 2015 to alert him to the delays in access caused by withholding complaints until after processing and to request that the media be provided access to complaints upon receipt, irrespective of whether processing had been completed. (*Id.* at ¶ 41, Ex. A.) Mr. Girdner did not receive a response and thus asked CNS' counsel to intervene. (*Id.* at ¶ 42.) In September 2015, CNS' counsel wrote to Defendant, outlining the decline in access in New York Supreme and requesting improvement. (*Id.* at ¶ 43.) No response was received, and in December 2015, CNS' counsel again wrote to Defendant. (*Id.* at ¶ 44.) Defendant responded in January 2016 and agreed to meet and discuss CNS' concerns. (*Id.* at ¶ 45.)

On February 18, 2016, CNS' counsel and its Northeast Bureau Chief, Adam Angione, met with Defendant and his deputy clerk. (Angione Dec. ¶¶ 35-36; Girdner Dec. ¶ 45.) After

CNS sent follow-up letters to Defendant and New York State Chief Administrative Judge Lawrence Marks on September 15, 2016, a second meeting was held, attended by CNS' counsel, Mr. Angione, and Defendant, together with Ronald Younkins, Executive Director of the New York Office of Court Administration ("OCA"), Richmond County Clerk Stephen Fiala, OCA General Counsel John McConnell, and Barry Clarke.  (Angione Dec. ¶ 37; Girdner Dec. ¶ 45.)

During the course of both meetings, CNS presented its concerns about the Clerk's policy and the resulting delays in access to new civil complaints, and Defendant (and other court officials, in the second meeting) discussed his reasons for these policies and practices as well as his reluctance to change.  (Angione Dec. ¶ 38; Girdner Dec. ¶ 50.)  Both meetings also included discussion about how other jurisdictions provided timely access to new civil complaints in an e-filing environment and various means of providing prompt, pre-processing access.  (Angione Dec. ¶ 38.)  At neither meeting did Defendant dispute CNS' data detailing substantial delays in access.  (*Id.*)

Defendant stated that new complaints were not "official" court records, and therefore not public, until after his office reviewed and processed the complaints and that complaints could be held in confidence by the Clerk's Office in the meantime. (Angione Dec. ¶ 39; Girdner Dec. ¶ 50.)  Defendant further stated that "review" included confirmation that the filing was made in the correct category (*e.g.*, civil, matrimonial, mental hygiene), making sure that certain private information was redacted, and, as a last step, affixing an index number.  (Angione Dec. ¶ 39.) He added that he had only one person in his indexing department and his budget might be cut even further, suggesting that the delays would continue or worsen, but conceded that providing access to newly-filed civil complaints prior to processing via the court's web site would be feasible with some software changes.  (*Id.*)

291712.4

Repeatedly at these two meetings, Defendant and at least one of his colleagues stated that clerks were required, or "mandated," to review complaints prior to releasing them to the public. (Angione Dec. ¶ 40.) However, they did not identify at these meetings any statute or rule on which this assertion was based. (*Id.*) Then, the day after the September 15, 2016 meeting, OCA issued a proposed court rule, 22 N.Y.C.R.R. § 202.5(b)(1), that would instruct "NYSCEF administrators" to "take steps to identify and restrict public view of portions of filed documents that display an individual's social security number." (Angione Dec. ¶ 40; Girdner Dec. ¶ 52.) There was no mention of this proposed rule at the September 15 meeting, and CNS has received no assurance in the seven weeks following that meeting that Defendant will take any steps to implement any of the suggested solutions for providing timely access to new complaints, regardless of processing, or to otherwise address the ongoing delays in access to New York Supreme civil complaints. (Angione Dec. ¶ 40; Girdner Dec. ¶¶ 52-54.)

## ARGUMENT

### A PRELIMINARY INJUNCTION IS NECESSARY TO CURTAIL DEFENDANT'S UNLAWFUL DEPRIVATION OF CNS' FIRST AMENDMENT RIGHT OF ACCESS TO NEWLY FILED CIVIL COMPLAINTS

To obtain a preliminary injunction, the moving party must demonstrate: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20-21 (2008). Even if the moving party can only demonstrate "serious questions" going to the merits, rather than a "likelihood of success," the preliminary injunction may issue nonetheless if "the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

291712.4

CNS satisfies this test.  Defendant's practice and policy of withholding newly filed civil complaints from public view until his office determines they are ready for public view – affecting on average one of every three cases, and often more, with delays ranging from one to five days – and his resulting failure to make new civil complaints available to the press in a timely manner constitute an effective denial of the right of public access to those documents in violation of the First Amendment.  CNS, and by extension its subscribers and readers, face irreparable harm if Defendant continues his practice and policy and thereby continues to deny proper access.  Given that the injunction CNS is seeking would only require Defendant to do what the Clerk's office had done for decades in the paper-filing context (*i.e.*, provide timely access to newly filed complaints irrespective of whether clerical processing has been completed) and what the vast majority of federal courts and a growing number of state courts already do in the e-filing context (provide timely access to e-filed complaints irrespective of whether administrative processing has been completed), and considering the public's strong interest in obtaining timely information about new civil actions filed at one of our nation's most important courts, the balance of equities clearly tips in CNS' favor.  Justice therefore requires that this Court enjoin Defendant's further enforcement of his policy of withholding access until after processing and direct Defendant to provide CNS with timely access to new civil complaints on their receipt for filing.

**A.**     **CNS Is Likely To Succeed On The Merits Because Delays In Access Are Denials Of Access, And Defendant Cannot Meet His Burden To Justify The Delays**

It has long been the law in the Second Circuit that the "presumption of immediate public access" applies whenever "a right to access is found."  *Lugosch*, 435 F.3d at 126.  Since that right of access applies to civil complaints, *Bernstein*, 814 F.3d at 141, Defendant's policy and practice of withholding them from public and press view until clerical processing is completed,

which frequently results in delays in access from one to five days, is unconstitutional unless Defendant can satisfy his burden to show his practices and policies are justified by an "overriding interest" based on findings that withholding new complaints is "essential to preserve higher values and is narrowly tailored to serve that interest." *New York Civil Liberties Union v. New York City Transit Auth*., 684 F.3d 286, 304 (2d Cir. 2012).

Defendant cannot meet this burden. Not only is his current policy and practice of withholding complaints until after clerical processing contrary to the decades-long tradition under which the press had access to New York Supreme complaints before processing, but the concerns Defendant has raised to justify it have not stopped many other courts, including this Court, the majority of federal district courts and a growing number of state courts, from providing access before clerical processing, even in the e-filing environment.

1.    **The First Amendment Creates A Presumptive Right Of Access To Civil Complaints As Soon As They Are Received For Filing**

In a series of seminal cases decided in the 1980s, the U.S. Supreme Court repeatedly affirmed the public and press' First Amendment right of access to criminal proceedings. *See*, *e.g.*, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 7-10 (1986) ("*Press-Enterprise II*"); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 509-13 (1984) ("*Press-Enterprise I*"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982); *Richmond Newspapers, Inc.*, 448 U.S. at 572-74, 589. The First Amendment right of access has been extended by the federal circuit courts not only to civil proceedings, but to records filed in those proceedings, and this Circuit has expressly found the right to apply to civil complaints. *Bernstein*, 814 F.3d at 140.

The First Amendment right of access is grounded in the right to free expression. As the Ninth Circuit noted in a case involving a California state court clerk's policy and practice of

withholding access until after processing – which was ultimately found to be unconstitutional[4] –

"[t]he Supreme Court has repeatedly held that access to public proceedings and records is an

indispensable predicate to free expression about the workings of government," and where, as

here, an action involves delays in access to civil complaints, "the deterred expression is …

informed public discussion of ongoing judicial proceedings." *Courthouse News Serv. v. Planet*,

750 F.3d 776, 785, 787 (9th Cir. 2014). Moreover, since the public depends upon the press for

information about its courts, "[t]he news media's right of access to judicial proceedings is

essential not only to its own free expression, but also the public's." *Id*. at 786.

A complaint "is the cornerstone of every case, the very architecture of the lawsuit. … It is

the complaint that invokes the powers of the court, states the causes of action, and prays for

relief." *Bernstein*, 814 F.3d at 140, 142 (citing *Fed. Trade Comm'n v. AbbVie Prods. LLC*, 713

F.3d 54, 62 (11th Cir. 2013)). It "forms the basis of a civil action and invokes the jurisdiction of

the Court. … it is a pleading essential to the Court's adjudication of the matter as well as the

public's interest in monitoring" the courts. *In re Eastman Kodak Cos. Application*, 2010 WL

2490982, at *1 (S.D.N.Y. June 15, 2010); *accord*, e.g., *Bernstein v. Bernstein Litowitz Berger &

Grossmann LLP*, 2016 WL 1071107, at *8 (S.D.N.Y. Mar. 18, 2016), *aff'd*, 814 F.3d 132 (2d

Cir. 2016) ("A complaint is the quintessential judicial document. A complaint is the invocation

of the power of one branch of government to resolve an otherwise-private dispute.").

---

[4] As the Central District of California ultimately found in *Planet*, the First Amendment right of
access to new complaints attaches on receipt – before processing – and withholding access to
new complaints until after processing violated that right. *Courthouse News Serv. v. Planet*, 2016
WL 4157210, at *1 (C.D. Cal. May 26, 2016) (order on cross-motions for summary judgment).
The court therefore "permanently enjoined [the clerk] from refusing to make newly filed
unlimited civil complaints and their associated exhibits available to the public and press until
after such complaints and associated exhibits are 'processed,' regardless of whether such
complaints are filed in paper form or e-filed." *Courthouse News Serv. v. Planet*, 2016 WL
4157354, at *1 (C.D. Cal. June 14, 2016) (entering judgment).

Conversely, when a complaint is withheld, it "leaves the public unaware that a claim has been leveled and that state power has been invoked – and public resources spent – in an effort to resolve the dispute." *Bernstein*, 814 F.3d at 141; *accord Bernstein*, 2016 WL 1071107 at *9 (district court decision) ("When a complaint is filed, and the authority of [the government] is thereby invoked, even if only as a threat to induce settlement, the American people have a right to know that the plaintiff has involved their power to achieve [the plaintiff's] personal ends.").

The First Amendment right of access to civil complaints "arises when a complaint is received by a court, rather than after it is 'processed.'" *Planet*, 2016 WL 4157210, at *13. In issuing an injunction invalidating a similar no-access-before-processing policy of a California court clerk, the Central District of California, in *Planet*, explained as follows:

> [I]t would be nonsensical for a qualified right of access to arise only after a complaint has been "processed," for such a rule would run contrary to the text of and purpose underlying various rules of court – including California Rule of Court 1.20(a), which requires that complaints be "deemed filed on the date [they are] received by the court clerk" – every time a complaint is not processed the day it is received for filing.

*Id.* at *13; *accord. Courthouse News Serv. v. Jackson*, 2009 WL 2163609, at *2-4, 11 (S.D. Tex. July 20, 2009) ("*Jackson*") (Houston court clerk's practice of delaying access to new civil petitions until after the completion of clerical duties, "is effectively an access denial and is, therefore, unconstitutional" because "'[e]ach passing day may constitute a separate and cognizable infringement of the First Amendment.'") (*quoting Grove Fresh*, 24 F.2d at 897).

### a. New York Supreme Complaints Are Filed On Receipt

The same principles hold true for complaints filed at New York Supreme. Complaints and other case-initiating documents are deemed filed upon delivery to the Clerk's Office,

notwithstanding any subsequent administrative obligations of the Clerk. C.P.L.R. § 304(c).[5]

Although the Clerk may have subsequent obligations, such as indexing or returning stamped

copies, it is the act of filing that commences the action and therefore creates an active judicial

record. *See id.* (listing subsequent clerical obligations); *Johnson v. Goord*, 288 A.D.2d 811, 812

(3d Dep't 2001);[6] *Campbell v. New York Evening Post, Inc.*, 245 N.Y. 320, 328 (1927) ("The

pleadings in an action in the Supreme Court may be filed in the office of the county clerk who is

the clerk of the court … and when so filed they become public documents.") (cited with approval

by the Southern District of New York in *Bernstein*, 2016 WL 1071107, at *7-8).

    Since a new civil action is initiated upon receipt of a complaint – and the date and time of

receipt of the complaint is deemed to be the date and time of receipt of filing – it therefore

follows that Defendant's policy and practice of withholding complaints until after processing is

completed, and the resulting delays in access of one to five days to an appreciable number of

those complaints, are effectively access denials and thus presumptively unconstitutional unless

Defendant can show his policy satisfies the stringent test for overcoming the First Amendment

right.[7]

---

[5] C.P.L.R. § 304(c) provides: "For purposes of this section [Method of commencing action or special proceeding]...filing shall mean the delivery of the summons with notice, summons and complaint or petition to the clerk of the court in the county in which the action or special proceeding is brought or any other person designated by the clerk of the court for that purpose."

[6] In *Johnson*, the Third Department addressed the question whether a petition was filed (for statute of limitations purposes) upon arrival at the Clerk's Office or upon assignment of an index number and ruled that the petition was filed upon delivery. *Johnson*, 288 A.D.2d at 812. The court further explained that the instruction to assign and index number "upon delivery" in C.P.L.R. § 304(c) "evinces the Legislature's intent to treat litigation papers as 'filed' within the meaning of C.P.L.R. § 304 only upon the physical receipt of those papers by the court clerk or the clerk's designee." *Id.*

[7] Although the relevant legal authorities state the First Amendment right of access is one of "immediate" access, CNS does not demand instant access in the literal sense, nor does CNS contend that the Constitution compels an injunction requiring simultaneous access upon filing as is provided via PACER in most federal district courts. Rather, it is regular delays in access that

### b. Even Short Delays Implicate First Amendment Rights

Indeed, in case after case – including many cited with approval in *Lugosch* – courts have found that delays in access to court documents, even short ones, are effectively access denials that implicate the First Amendment. *E.g.*, *Doe v. Public Citizen*, 749 F.3d 246, 272 (4th Cir. 2014) ("Because the public benefits attendant with open proceedings are compromised by delayed disclosure of documents, we … emphasize that the public and press generally have a contemporaneous right of access to court documents … when the right applies"); *Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1147 (9th Cir. 1983) (district court judge's withholding court records from public access for the first 48 hours after submission to determine if sealing was appropriate was "a total restraint on the public's first amendment right of access even though the restraint is limited in time"); *Grove Fresh*, 24 F.3d at 897 ("[i]n light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous"); *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 507 (1st Cir. 1989) (delaying access to court filing, even for "as little as a day," "delays access to news, and delay burdens the First Amendment").

The reasons for this rule – that even temporary access delays implicate constitutional concerns – are clear. As the courts have explained, it is only while the cases are still "current news that the public's attention can be commanded." *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 250 (7th Cir. 1975); *see also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 561 (1976)

---

range from one to five days resulting from Defendant's blanket policy of withholding access until after clerical processing that cannot be justified and compel an injunction requiring timely access following receipt of a complaint for filing, irrespective of whether processing has been completed. Exactly how that is accomplished is up to Defendant, and while providing simultaneous access to complaints upon filing at New York Supreme via the same web sites currently used to provide access after processing is one option available to Defendant, it is not the only option. *See* Section C, *infra*.

291712.4

("the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly"); *In re Charlotte Observer* (*Div. of Knight Pub. Co.*), 882 F.2d 850, 856 (4th Cir. 1989) (delaying access "unduly minimizes, if it does not entirely overlook, the value of 'openness' itself, a value which is threatened whenever immediate access … is denied, whatever provision is made for later public disclosure."); *accord Grove Fresh*, 24 F.3d at 897.

Thus, in *Planet*, although the Central District of California declined to find a "bright-line rule" requiring same day access to new civil complaints in all circumstances for the purposes of the summary judgment motions before him, he went on to find, for the purposes of his permanent injunction, that the clerk's practice of withholding access to new complaints filed late in the day until the next court day did not pass constitutional muster. *Planet*, 2016 WL 4157210 at *20; *accord id.* at *13 (clerk did not "meaningfully dispute that timing is a critical element of a story's newsworthiness"). Similarly, in *Jackson*, the Southern District of Texas rejected a Houston court clerk's contention that delaying access to new paper and e-filed civil petitions until after clerical processing was not the "'functional equivalent' of an access denial" and was "thus, unconstitutional." *Jackson*, 2009 WL 2163609, at *4. The same is true here.

## 2. Defendant's Policies And Resulting Delays Do Not Satisfy Constitutional Requirements For Withholding Judicial Records

Since even short delays in access to complaints implicate the First Amendment, Defendant cannot withhold newly-filed civil complaints pending clerical processing unless he can satisfy the strict test for denying access to judicial records to which there is a First Amendment right of access. Under that test, newly filed complaints may not be withheld unless the proponent of withholding access – in this case, Defendant – demonstrates that it is justified by an "overriding interest" based on findings that withholding is "essential to preserve higher

values and is narrowly tailored to serve that interest." *New York Civil Liberties Union*, 684 F.3d at 304; *accord Bernstein*, 814 F.3d at 144; *Lugosch*, 435 F.3d at 120; *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987).  The proponent of withholding access bears the burden of proof to make this showing.  *E.g., Bernstein*, 814 F.3d at 144; *Lugosch*, 435 F.3d at 126.  Any "justification in denying access must be a weighty one" and "must be rare and only for cause shown." *New York Civil Liberties Union*, 684 F.3d at 304.

Over the course of two meetings with CNS, Defendant stated that in addition to his position that a complaint is not a public record until after it is administratively processed, he believed withholding access until after processing was necessary to ensure private information was redacted, confirm that cases are filed in the correct category, and affix an index number.  But CNS regularly sees – and reports on – complaints that have not yet been assigned index or case numbers in other jurisdictions.  (Girdner Dec. ¶ 50.)  As for the concern about private information and cases being filed in the correct category, these issues are not unique to New York Supreme, and yet other courts – including this Court – have found ways to address these concerns without delaying access until after the completion of clerical processing.[8]  (Girdner Dec. ¶ 50; Angione Dec. ¶¶ 25-34.)  Defendant's concerns are also similar to the objections raised by court clerks in the *Planet* and *Jackson* cases, and in both instances, federal district courts ultimately enjoined those clerks from enforcing their no-access-before processing policies. *Planet*, 2016 WL 4157210, at *13; *Jackson*, 2009 WL 2163609, at *4.

It also bears note that these same issues existed even in the paper-filing environment.  Yet

---

[8] Indeed, New York law has already assigned the burden of redacting confidential information to the filer – not the Clerk's office – as have the federal courts and most states.  *See* Girdner Dec. ¶ 50; 22 N.Y.C.R.R. § 202.5(e); *see also* FED. R. CIV. P. 5.2 (similarly placing burden of redaction on filer).  It is this rule that Defendant now seeks to change, not by removing the protection already provided, but by adding a second burden on the Clerk's office to take steps to ensure confidentiality.

18

for decades, new civil complaints were made available to the press on a pre-processing basis. (Angione Dec. ¶ 25; Girdner Dec. ¶ 3.)  As the Second Circuit has explained, "[c]omplaints have historically been publicly accessible by default, even when they contain arguably sensitive information."  *Bernstein*, 814 F.3d at 141.

Prior to instituting electronic filing, the 2004 New York Commission on Access to Public Records ("Commission") repeatedly recommended that electronic filings maintain the level of access available traditionally in paper filings:

> Our basic conclusion is that … the rules and conditions of public access to court case records should be the same whether those records are made available in paper form at the courthouse or electronically over the Internet. … No additional limitations should be placed, on an across-the-board basis, on placing court case records on the Internet so long as those records are public in nature and conform to the requirements of the Commission's recommendations.[9]

Commission on Public Access to Court Records, Report to the Chief Judge, February 2004 (available at http://www.nycourts.gov/ip/publicaccess/Report_PublicAccess_CourtRecords.pdf). The Commission specifically "considered and rejected the proposition that electronic case records should be subjected to special limitations not applicable to paper records such as some sort of time gap after filing before those records are made public in the form they were filed," *id.* at 6, and made this record during the paper filing era when journalists were routinely allowed pre-processing access in New York Supreme and other courts.  (Girdner Dec. ¶ 18.)

Given all this, it cannot be said that the reasons Defendant has given to justify his practice and policy of delaying access until after processing are sufficient to overcome the First Amendment, particularly when this policy delays access to an average of one-third of newly filed

---

[9] The Commission, established by then New York Chief Judge Judith Kaye and chaired by Floyd Abrams, specifically aimed to evaluate whether additional protections would be needed for e-filing of court documents.  *Id.* at 1.  The Report defined "court documents" as "documents, information or other things that are collected, received or maintained by a court, or by a county clerk on behalf of a court, in connection with a court case."  *Id.*

complaints (and sometimes more as access on any particular day is highly variable) for between one and five days and particularly impacts the late-filed and most newsworthy complaints.

**B.     CNS, Its Subscribers, And The Public Will Be Irreparably Harmed Without Injunctive Relief**

Irreparable harm is defined as the "kind of injury for which a money judgment cannot compensate," *Pamlab, L.L.C. v. Macoven Pharms., L.L.C.*, 881 F. Supp. 2d 470, 476 (S.D.N.Y. 2012), or one that "(a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010). This may include losses that are "difficult to replace or difficult to measure" or harm that "one should not be expected to suffer." *Id.*

It is axiomatic that, "[t]he loss of First Amendment freedoms, for even minimal periods of time, normally constitutes irreparable injury." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("[i]n the context of a motion for a preliminary injunction, '[v]iolations of First Amendment rights are commonly considered irreparable injuries'" (cit. omit.)), *aff'd,* 2 F. App'x 112 (2d Cir. 2001); *see also Bery v. City of N.Y.*, 97 F.3d 689, 693 (2d Cir. 1996) ("'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'") (*citing Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The ongoing infringement of First Amendment rights does not only affect CNS; "if CNS' protected expression [about new litigation] is delayed … then the expression of the newspapers, lawyers, libraries and others who rely on CNS for information will also be stifled." *Planet*, 750 F.3d at 788.

In addition, CNS will suffer irreparable injury without injunctive relief because the delays in access diminish the value of CNS' reports to its subscribers (Girdner Dec. ¶ 25), leading to a loss of goodwill, especially given that CNS is regularly being scooped by competing

media on major stories as result of the blackout period in access created by Defendant's policies and practices. *Id.* ¶ 26; *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (finding risk of irreparable harm to media's reputation and goodwill if unable to publish news photograph); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("... injunctive relief is appropriate where it would be 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come'").

**C.     The Balance Of Equities Tips In Favor Of CNS**

In contrast, Defendant would suffer little to no inconvenience as a result of a preliminary injunction. As is demonstrated by the practices of other jurisdictions, providing timely, pre-processing access to newly e-filed civil complaints is easy to do, and several options are available to Defendant here. The most efficient means is by providing pre-processing access via computer terminals already located at the courthouse and making them available to the press after hours or by providing pre-processing access remotely online (as available in this Court and many others). (*See, e.g.*, Girdner Dec. ¶¶ 36-40; Angione Dec. ¶¶ 25-34.) Thus, as in the *Jackson* case, absent injunctive relief, "Plaintiff will be denied its First Amendment right of access to new case-initiating documents unless the Court issues this preliminary injunction, while Defendant[] ha[s] alternative, constitutional ways to achieve [his] goals and address [his] administrative concerns." *Jackson*, 2009 WL 2163609, at *5 (concluding injury to CNS outweighed any damage any injunction requiring timely access could cause Houston court clerk).

**D.     Injunctive Relief Would Serve The Public Interest**

Here, as in the *Jackson* case, "[i]t is clearly in the public interest to enjoin [Defendant's] conduct. There is an important First Amendment interest in providing timely access to new case-

initiating documents." *Jackson*, 2009 WL 2163609, at *5. Although the right of access to complaints belongs to the public at large, it bears note that ordinary citizens do not generally make a practice of reviewing the flow of newly filed civil actions on a daily basis. But as the courts have recognized, safeguarding CNS' First Amendment right of access also safeguards the rights of its subscribers and the general public to learn about new civil complaints in a timely manner, all to the public interest. "In a society in which each individual has but limited time and resources with which to observe at first hand the operations of the government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations … a public benefit is performed by the reporting of the true contents of [public court records] by the media." *Cox Broad. Corp. v. Cohen*, 420 U.S. 469, 491, 495 (1975); *accord Reeves v. American Broad. Cos.,* 719 F.2d 602, 607 (2d Cir. 1983) ("individuals with limited time and resources to gather information concerning matters of public import rely upon the press to perform this critical task"); *see also Lugosch*, 435 F.3d at 123 ("consideration of the Newspapers' ultimate interest in the case should not affect the weight of the presumption: … those interested in monitoring the courts may well learn of, and use, the information whatever the motive of the reporting journalist").

An injunction would also safeguard the public interest by improving news reporting on newsworthy new civil litigation at New York Supreme. Defendant's current policy creates a delay which allows enterprising plaintiffs' attorneys to control the news cycle, and limited (or impeded) access to the actual pleadings lessens the accuracy of reporting and the number of sources able to report meaningfully on matters of public concern. (Girdner Dec. ¶¶ 25-26.) An injunction returning access to New York Supreme complaints to the traditional place at the point of receipt, before processing, would remedy those problems, all to the public interest.

### E.  Bond Should Be Waived Or Set At A Nominal Amount

The injunction bond under Rule 65(c) of the Federal Rules of Civil Procedure is merely a security device.  CNS is not asking Defendant to hire more staff or speed up processing, and Defendant is already providing access to civil complaints, albeit on a delayed basis and only after administrative processing.  CNS simply asks that Defendant be required to cease his practice and policy of withholding access to the newly-filed complaints until after clerical processing has been completed, thus enabling the media to have the same timely access to new complaints that it traditionally had to paper-filed New York Supreme Complaints and that the media has to e-filed complaints at this Court, other federal district courts, and a growing number of state courts as they transition to e-filing.

Where the enjoined party is unlikely to suffer monetary damages and the constitutional issues at stake are shown to be of great importance, as here, the Court need not impose a bond. *Donohue v. Mangano*, 886 F. Supp. 2d 126, 163 (E.D.N.Y. 2012) ("Thus, given the important potential constitutional issues, the Court, in its discretion, dismisses the bond requirement under Fed. R. Civ. P. 65(c)."); *Kermani v. N.Y. State Bd. of Elecs.*, 487 F. Supp. 2d 101, 115–16 (N.D.N.Y. 2006) (declining to impose bond, given low risk of monetary loss and "given the important constitutional and public policy issues arising in this matter").  CNS thus respectfully requests that the bond requirement be waived or at least set at a nominal amount.

### CONCLUSION

A longstanding tradition of prompt public access to judicial documents protected by a federal constitutional right should not be undercut by a fundamentally administrative change such as the introduction of e-filing (and Defendant's imposition of administrative processing before access is provided).  But that is exactly what has happened at New York Supreme, and

what will continue to be the case unless this Court intervenes.

Because "'[e]ach passing day may constitute a separate and cognizable infringement of the First Amendment,'" *Lugosch*, 435 F.3d at 126 (*quoting Nebraska Press*, 427 U.S. at 1329), a preliminary injunction is appropriate, and CNS respectfully requests that Defendant be preliminarily enjoined from continuing his practices and policies resulting in delayed access to new civil complaints, including, *inter alia*, his practice of denying access to new complaints until after processing and requiring him to provide timely access to newly filed civil complaints, as had been provided prior to electronic filing in New York Supreme.

Dated: November 14, 2016

Respectfully submitted,

/s/ William B. Hibsher
William B. Hibsher
Jacquelyn N. Schell
**BRYAN CAVE LLP**
1290 Avenue of the Americas
New York, New York 10104
WJHibsher@bryancave.com
Jacquelyn.Schell@bryancave.com

*Attorneys for Plaintiff Courthouse News Service*