1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   COURTHOUSE NEWS SERVICE,

4                   Plaintiff,

5            v.                          16 Civ. 8742 (ER)

6   MILTON TINGLING,
                                         Argument
7               Defendant.
    ------------------------------x

8
                                         New York, N.Y.
9                                        December 16, 2016
                                         3:00 p.m.
10
    Before:
11
            HON. EDGARDO RAMOS
12
                                         District Judge
13

14

15
            APPEARANCES
16

17
    BRYAN CAVE LLP
18      Attorneys for Plaintiff
    BY:  WILLIAM J. HIBSHER
19       JACQUELYN N. SCHELL
         DANIEL H. LEWKOWICZ
20

21  LEE A. ADLERSTEIN
        Attorney for Defendant
22

23

24

25

 1              (Case called)

 2              THE COURT:  Good afternoon.  Everyone can be seated.

 3              This matter is on for a show cause hearing for

 4  preliminary injunction brought by Courthouse News Service

 5  seeking to enjoin the clerk of the court of the New York State

 6  Supreme Court, New York County, from essentially withholding

 7  newly filed complaints while certain administrative tasks are

 8  conducted.

 9              We will begin with you, Mr. Hibsher.  You can remain

10  seated if you wish.  If you have a microphone, speak directly

11  into the microphone.  Or you can stand, as you wish.

12              MR. HIBSHER:  Thank you, your Honor.  Your Honor,

13  Courthouse News Service reports on civil cases filed in federal

14  and state courts throughout the country.  With the Court's

15  permission, I would like to reserve some rebuttal time for

16  after my adversary speaks.

17              THE COURT:  Sure.

18              MR. HIBSHER:  Thank you.

19              Until the advent of electronic filing in the New York

20  State courts, CNS had access to nearly all civil complaints by

21  the end of each day on which they were filed.  But with

22  e-filing, perhaps counterintuitively, there are now substantial

23  delays in access to newly filed cases in New York supreme.  New

24  York supreme is one of the country's most prolific and most

25  important courts.  On average, CNS sees less than two-thirds of

1    the cases filed.  One out of three cases filed each day are

2    withheld from CNS and from the public.  Often the delay is

3    greater than one day.

4            THE COURT:  Is it ever greater than one day if it's a

5    regular workday, not a weekend or a holiday?

6            MR. HIBSHER:  Yes, your Honor.  The sampling that we

7    provided in both the complaint and in the Angione affidavits

8    lists the numbers of complaints that are produced on the same

9    day.  Then there is a second column in paragraph 24 of the

10   Angione affidavit which says one-day delay, and then a third

11   column which says third-day delay.

12           For example, on January 12th, 2016, which was a

13   Tuesday, 58 percent of the cases were made available to the

14   public and the press on the same day but 42 percent of those

15   Tuesday cases were not.  The sampling that we provided shows a

16   number of instances in which weekday filings were not made

17   available on the same day.

18           THE COURT:  I asked whether it took more than a day.

19   Using that example that you just provided, were there any cases

20   that were withheld until the Thursday, say?

21           MR. HIBSHER:  I think the several-day delays occurred

22   on weekends and/or holidays joined by weekends.  Usually, it's

23   a next-day filing.  As you know, this is a sampling.  We did

24   not go through every single filing comprehensively.  Here we

25   are on January 22nd.  69 cases were filed.  That must have been

1    a Friday, your Honor.

2           I can go through the data and supplement my remarks

3    with a response to that question, but as I stand here, I don't

4    know for sure whether the delays in filings on nonweekend and

5    holiday days were greater than one day.

6           THE COURT:  That is my understanding.  If that is the

7    case, you're getting every complaint within 24 hours, say?

8           MR. HIBSHER:  Cases are filed in the morning.  I think

9    it would be better to say that we are getting cases filed on

10   non-Friday weekdays that do not precede a holiday by the end of

11   business the next day.  It may not be 24 hours.  It may be 30

12   hours or more.  I'm splitting hairs, but I want to be clear

13   about what the delay is.

14          The delay is important.  It may not seem like a major

15   delay, but access to judicial documents is essential to public

16   understanding the court process.  This is a concept that has

17   been developed by a number of cases, beginning in 1980 with the

18   Supreme Court's Richmond News and culminating with the

19   Bernstein decision in the Second Circuit this year, which made

20   clear that complaints are entitled to constitutional access

21   under the First Amendment.

22          Despite the nature of the delay, it is well known that

23   news quickly goes stale.  It is the function of the press to

24   report on news promptly largely because the news worthiness of

25   a story is often fleeting.  The loss of a First Amendment right

1    of access to court documents, which we think Bernstein clearly

2    establishes here, even for minimal periods, constitutes

3    irreparable injury under the First Amendment.

4         Those lines are not just my words.  Those lines are

5    taken from the Supreme Court and the Second Circuit cases,

6    which we cited in our brief.

7         THE COURT:  Is there authority within the Second

8    Circuit that defines how quickly access has to be provided?

9         MR. HIBSHER:  Lugosch in the Second Circuit referred

10   to immediate access.  Bernstein quotes Lugosch and says once a

11   First Amendment right of access attaches, the access must be

12   immediate.  The Supreme Court uses the word "immediate."  Fresh

13   Grove in the Seventh Circuit, one of the leading cases in this

14   area, uses the words "immediate" and "contemporaneous."

15        There are no cases in the Second Circuit which parse

16   this particular factual issue, but Bernstein makes clear that a

17   complaint is entitled to First Amendment protection.  All of

18   the cases dealing with First Amendment access, whether they

19   arise in connection with sealing or with limited access to

20   certain kinds of judicial proceedings, all talk about the First

21   Amendment right of access being one that is immediate.

22        When we are talking about the media and the fleeting

23   nature of the news, and particularly when we are in a setting

24   like New York City, which is the media capital, and a court

25   like the supreme court in New York County, where so many of the

cases are of incredible importance, a delay of one day is really a news cycle.

We put into our moving papers three newsworthy examples of cases which were filed on one day.  Trump v. Univision was one.  The filing attorney received a received stamp from the system that receives electronically filed documents, and within an hour or two a page 6 online New York Post had a story of Trump suing Univision for its cancellation of the of the Miss Universe pageant.  The Courthouse News Service and the public did not see that case for 22 hours.

THE COURT:  You just said the New York Post ran the story.

MR. HIBSHER:  It did.

THE COURT:  So the public therefore had access to the story.

MR. HIBSHER:  The public that reads New York Post had it.  But the single media outlet was fed that unprocessed and unofficial copy of the complaint.  We have copies of it in our reply declarations which show the copy that the lawyer who filed it received on the day it was filed as well as the official copy 22 hours later the next day.

The lawyer who filed that complaint undoubtedly fed that complaint to the media outlet of his or her choice.  Did it become public after the lawyer did that?  Perhaps.  But Courthouse News Service, which has hundreds of subscribers,

1  many of which are media outlets, did not have that case

2  available and was questioned by many of its subscribers as to

3  why it did not.

4          THE COURT:  Why is that of First Amendment

5  significance?  I understand that if the complaint had not been

6  made available at all.  But the fact that a newspaper had it

7  and made it available immediately, doesn't that assuage the

8  concern that the public not have access to it?

9          MR. HIBSHER:  On the contrary.  The fact that a

10  litigant or a lawyer can feed a filed complaint, which is a

11  judicial document and to which he has received a received

12  stamped from the court, can feed that document to a media

13  outlet of choice is a kind of unevenhandedness that I believe

14  the First Amendment seeks to eliminate.

15          THE COURT:  Do you think that the First Amendment

16  seeks to create a level playing field for newspapers, radio

17  stations, news outlets, etc.?

18          MR. HIBSHER:  I think the law considers the press to

19  be a surrogate for the public.  It doesn't discriminate.  It

20  considers the press in general to be a surrogate for the

21  public, and I think there is an assumption that the press will

22  be treated evenhandedly.  I have not seen a case which parses

23  this particular issue out.

24          THE COURT:  I asked the series of questions because

25  you appear to base your argument at least in part on the fact

1   that Courthouse News Service is being harmed.  But it will

2   always be the case that a litigant will or may favor one media

3   outlet or another.  There is certainly nothing that courts can

4   do about that, whether you are getting immediate access or not.

5   For example, a litigant can give a draft of a complaint that is

6   going to be filed to a favored reporter.

7         MR. HIBSHER:  This is true.  The difference, however,

8   is this when a litigant gives a draft of a complaint, whether

9   it is to encourage settlement or for any other reason, that

10  litigant is giving an unofficial copy of the complaint.  The

11  litigant does not have the protection of the privilege that one

12  gets when one has filed information in a publicly filed

13  complaint.  The recipient has no certainty that the complaint

14  will ever be filed.  And that is a process that we have seen

15  since litigation began.  Drafts of complaints are exchanged for

16  all sorts of reasons.

17        When it is an official court document -- Bernstein

18  makes this very clear -- a First Amendment right attaches at

19  the moment that it becomes an official court document.  Cases

20  that we cite in our brief are really eloquent in talking about

21  the press's role in informing the public and particularly

22  informing the public on the institution of the judiciary.

23        The news cycle is fleeting.  When there is a delay of

24  one day or when a litigant is allowed to provide a copy of an

25  official court document that he has received a stamp on but the

1    public has not yet seen to a particular news outlet, we believe

2    that creates a First Amendment violation.

3           THE COURT:  Why are you here alone?  Why is CNS here

4    alone?

5           MR. HIBSHER:  Your Honor, we have litigated this issue

6    in several federal courts around the country.  We talked in our

7    papers about the Central District of California case called

8    Planet, a Southern District of Texas case as well.  In some of

9    those cases amici have come in that have been representatives

10   of the press.  The Planet case went to the Ninth Circuit two

11   times.  And there were numerous representatives of news

12   organizations that joined those cases.

13          At this stage, particularly in the preliminary stage,

14   we did not reach out to news organizations to try to solicit

15   that interest.  We were hopeful that the issues that we

16   articulate in this case would be resolved amicably.  We talk

17   about our efforts to do that in our papers, and we continue to

18   be hopeful that that is a possibility.

19          THE COURT:  You say preliminary.  Certainly it is

20   preliminary at least at the stage of this litigation.  But the

21   papers that you submitted indicate that you have been trying to

22   get the clerk to provide you with this access going back to at

23   least I think it was July of last year.

24          MR. HIBSHER:  Correct.

25          THE COURT:  Were any efforts made to bring in fellow

1    newspaper --

2           MR. HIBSHER:  No, your Honor, we have not made an

3    effort in this jurisdiction toward that end.  It is possible,

4    if this case continues, that this will be an issue that we will

5    certainly make other media aware of.  That may follow.  But we

6    have not made that effort, we have not been turned down.  That

7    is the status on that one.

8           THE COURT:  You provide in your papers comparisons of

9    what other courts do, including this court and other states

10   around the country.  Can you give me a rundown, one or two, of

11   what the other New York City counties do.

12          MR. HIBSHER:  All the counties in New York City follow

13   the processing rules that are followed here.  By "here" I mean

14   New York supreme.  This is a statewide issue.  The numerosity

15   of filings and the importance of filings in New York County far

16   outweigh any of the other counties in New York State.

17          THE COURT:  If I issue the injunction that you

18   request, who will it affect?  What courts will it affect?

19          MR. HIBSHER:  It will affect New York supreme court,

20   your Honor, and it will affect the clerk of New York County.

21          THE COURT:  All right.

22          MR. HIBSHER:  Your Honor, the defendant in their

23   responding papers does not deny that his administrative

24   processing causes delays, nor does he take issue with the

25   sampling data that we included in our moving papers, though he

1    characterizes it as misleading.

2             THE COURT:  And exaggerated.

3             MR. HIBSHER:  And exaggerated.  He talks about the

4    numbers of weekend filings that are included in our sampling.

5    We believe that once the court allows electronic filings after

6    hours and on weekends and once the filings that occur during

7    those times become official court records, as they do

8    instantaneously when they receive a received stamp and the

9    statute of limitations is tolled under the law, that we have a

10   right to see those documents.  In the end, relatively few cases

11   are filed on the weekend.  I think weekends and holidays only

12   constitute about 3 percent of all of the cases filed.

13            THE COURT:  If I read the papers correctly, the New

14   York supreme court closes at 5:00.

15            MR. HIBSHER:  Correct.

16            THE COURT:  But you may still file complaints

17   electronically after 5 o'clock.

18            MR. HIBSHER:  24-7, your Honor.

19            THE COURT:  Including weekends?

20            MR. HIBSHER:  Including weekends and holidays.

21            THE COURT:  As I understand it, if you file

22   electronically after 5:00 p.m. on a particular day, the

23   complaint is deemed filed as of the following business day.  Am

24   I correct about that?

25            MR. HIBSHER:  No, your Honor.  It is deemed filed as

 1    of the moment that you electronically file it.

 2          THE COURT:  What access do you want?  If something is

 3    filed at 8 o'clock in the evening or on a Sunday morning, what

 4    are you looking for with respect to those filings?

 5          MR. HIBSHER:  We would like to see those complaints as

 6    we do in this courthouse and in the vast majority of federal

 7    courts where the complaints go on to PACER for the entire world

 8    to see.

 9          The defendant is concerned about revealing complaints

10    that may not have been processed because some of those

11    complaints may have incorrect venues or they may be matrimonial

12    actions that are filed in New York supreme improperly.  Our

13    response to that is that there are safeguards in place when you

14    file electronically that alert the filer and there are laws in

15    place that place the burden on the filer to redact personal

16    information and to make certain that a matrimonial action is

17    not filed.

18          What we are asking for here is not Internet

19    instantaneous access.  What we are asking for is timely access

20    upon filing.  Traditionally, the press room at New York supreme

21    stays open long after the courthouse closes.  There is a

22    terminal in that press room.  It is the very same terminal onto

23    which cases, after they are processed, flow.

24          What we are asking the defendant to do is to make

25    cases that are filed with the Court and are official court

1    documents available to the press and public upon receipt in a

2    timely way.  That is the injunction that the district court in

3    Planet in the Central District of California issued.

4          In the Jackson case in the Southern District of Texas

5    the court issued an injunction requiring the clerk to provide

6    same-day access.  In Planet the judge issued an injunction that

7    required the court to provide timely access but precluded

8    administrative processing before access and effectively

9    provided same-day access.  That is what we are seeking here.

10         THE COURT:  I'm just trying to see what an injunction

11   would look like.  If something is filed on a Sunday morning --

12   I know this building is open 24-7.

13         MR. HIBSHER:  The press room in this building is open

14   24-7.

15         THE COURT:  What is the story across the street?  Does

16   the building shut down?

17         MR. HIBSHER:  The building shuts down at 5:30, when

18   the last security guard leaves.  But people are allowed to

19   remain in the supreme court building, and there is an exit

20   which people who stay late use, including members of the press

21   who are in the building before the closes and who stay late.

22         THE COURT:  For a Sunday morning filing, Sunday

23   morning electronic filing, are you requesting that the building

24   be open for the press or remain open for the press?

25         MR. HIBSHER:  Not necessarily.  That filing can be

1   made available electronically, and it could be made available

2   just to credentialed reporters.

3            THE COURT:  Off-site, remotely?

4            MR. HIBSHER:  Off-site.  It could be done on-site.

5   But we are not asking the court to open its doors at 8 o'clock

6   on Sunday.

7            THE COURT:  Do you have that access now, remote

8   access?

9            MR. HIBSHER:  We have remote access to the official

10  filings now on the New York State website where cases flow, and

11  we have access in the press room to cases that are processed.

12  What we would ask for is either on-site or remote access.  It

13  doesn't have to be made available to the public until the clerk

14  of the court has an opportunity to do whatever processing it

15  deems necessary, and those cases which have been filed with the

16  court and are judicial documents would be made available to the

17  press in that manner.

18            It is not exactly what you have in the Southern

19  District, where cases flow immediately onto PACER for the world

20  to see 24-7.  We would be very content with something sub-

21  stantially less than that.  Our issue here is not that we put

22  these cases on the Internet for the world to see.

23            The kinds of data that the clerk says in his papers he

24  is concerned about catching, like improper venue cases stamped

25  Kings County supreme and somehow the lawyer files it in New

York supreme, we would get to see that under the injunction

that I propose, and the clerk of the court would have an

opportunity after it goes public to do whatever the clerk of

the court needs to do to claw that back or to inform the filer

that it was a Kings County document improperly filed.

THE COURT:  I take it, and I think you made a

reference to it in your papers, that New York State laws, court

rules, applicable regulations put the onus on the litigants to

make sure that that type of information -- Social Security

numbers, identities of minor sexual abuse victims, for

example -- that type of information is not put in filings or,

if it is, it is put in some redacted fashion, correct?

MR. HIBSHER:  Correct.  The same sort of rules exist

in the federal system, which put the burden on the filer to

redact privacy information.  When one files in the state

system, in New York supreme, one is repeatedly reminded about

the redaction rules.  One has to check a box saying that I have

read the redaction rules and I have complied with those rules.

THE COURT:  If you want to file electronically a

matrimonial matter, could you?

MR. HIBSHER:  We appended to the reply affidavit

screenshots of what the filer sees.  The categories do not

include matrimonial.  I asked my colleagues, who do this all

the time, that very question: could you file a matrimonial

action if you really wanted to?  The answer is perhaps.  You

might check off tort and file a matrimonial action as a tort.

Under the proposal that I am asking your Honor to order, that

is a matrimonial action that would then be made available to

the press.

However, this is a First Amendment case.  There is a

First Amendment right of access that has attached.  The law is

very clear that once that occurs, the burden shifts to the

defendant to show that he has an overriding interest, that that

interest is essential to preserve higher values, and that is

narrowly tailored to preserve that interest.

The defendant has to come forward with facts to

illustrate the harm that he has hypothesized in his papers.  He

is the filer.  Presumably he has the data on the errant filings

that he describes in his complaint.  He has the numbers on the

matrimonial actions that have erroneously been filed, e-filed,

in state supreme court and would, had the clerks of his

department not caught them, have been made public in violation

of the law.

THE COURT:  How many are there, do you know?  Do you

have a sense of how many actions are picked up by this review

process that the clerk goes through?

MR. HIBSHER:  I do not have a sense because the

defendant's papers are completely silent on any data at all.

The cases which we cite make very clear that the harm that they

allege in support of a process that prevents access under the

1    First Amendment has to be provided, has to be illustrated with

2    empirical evidence.  There is no data whatsoever in their

3    papers.  They have not met a key element of their burden to

4    show what this harm is.

5         THE COURT:  Even assuming for the sake of argument

6    that filing something improvidently because of venue would

7    equal the value of allowing the press prompt access, assuming

8    those two values -- poor venue, First Amendment access -- are

9    essentially equal, for the sake of argument we don't have a

10   sense as to whether or not people are filing in the wrong venue

11   so often that it begins to trump the First Amendment right?

12        MR. HIBSHER:  I do not have any sense of numerosity.

13   Having gone through the filing instructions several times now,

14   I would be very surprised if very many matrimonial actions are

15   filed as tort actions or real estate actions or any other

16   actions in New York supreme.

17        THE COURT:  What about the situation where the

18   administrative review picks up a Social Security number, say?

19        MR. HIBSHER:  Good example.  There is a specific law

20   in New York that puts the burden on the filer to redact that

21   information, which we cite in on you papers.  The e-filing

22   prompts make very clear that Social Security numbers and other

23   private information has to be redacted and reminds the filer --

24   who is typically an attorney who has an account with the court

25   system; when he presses that submit button, he has to have an

1   account -- reminds the attorney that he has to comply with

2   those redaction rules.

3          As I read the defendant's declaration in this case, I

4   must say I do not see a declarative statement that the

5   defendant's office reviews the pages of a complaint to find out

6   if they contain Social Security numbers or other private

7   information.  They certainly suggest that they review papers

8   for venue and for attorney's signature and for proper captions

9   so the captions don't say "et al."

10          Attorney's signatures are taken care of in the

11   e-filing system because when you press submit, you are effect-

12   ively signing the document.  In the old days the cashier

13   collected your fee for the index number.  The electronic system

14   is accomplishing that task as well.

15          The kind of thing that the statute which he cites

16   might require him to review, something like improper venue, is

17   the sort of thing that we believe could not possibly override

18   the First Amendment entitlement that we have.

19          THE COURT:  I think they either said this or suggested

20   this in this their papers, and I will ask them the same thing.

21   Part of your argument is that before e-filing, CNS and other

22   news organizations had same-day access to all of the complaints

23   that were filed on a particular day prior to the type of

24   processing they are doing now and not letting you see until

25   they process?

1          MR. HIBSHER:  Let me clarify.  The defendant took

2    issue with a certain part of that contention in our moving

3    papers.  What we are saying is that prior to e-filing we saw

4    virtually 100 percent of all the filings on the same day.  The

5    system was that if you were a lawyer, if you were a clerk at a

6    law firm, you went up to the cashier's office, you paid your

7    money, you handed that cashier your papers.

8          The cashier might have done a quick, cursory review,

9    might have looked at venue, for example, and said, counselor,

10   this says Kings County, go across the river, collected your

11   money.  They might have looked for an attorney's signature.

12   But that was it.

13         We are not suggesting that there was absolutely zero

14   quick processing that occurred in the pre-electronic filing

15   era.  What we are saying is we had 100 percent access during

16   that time.  When e-filing came into being, the commission,

17   which really studied the process, made very clear that the kind

18   of access that existed prior to e-filing, access to court

19   documents -- they were very specific before the Bernstein

20   decision on complaints -- needed to continue unimpaired and

21   uninterrupted.  That is not what has happened here.

22         The rules which they cite, even if they are abiding by

23   those rules, are rules that cannot under the law, to use your

24   Honor's word, trump the First Amendment.  The Second Circuit

25   says, "Obviously, a statute cannot override constitutional

1    right."  The constitutional right here is absolutely crisp.

2             THE COURT:  In other words, those rules say that the

3    clerks have to take certain steps; it does not say that it

4    cannot provide access to the press until those steps are taken?

5             MR. HIBSHER:  Exactly.  None of those rules say that

6    the clerk has to do anything prior to releasing documents to

7    the press or the public.  The rules that require the clerk to

8    do anything, if they do, and I think there is a bit of an

9    argument there, are very limited to things like venue,

10   signature of attorney.  The Social Security number piece is

11   something that I have looked at very closely, and I did not

12   find it in the current rules as an obligation placed on the

13   clerk's office to actually do.

14            Our position is that when we have a clear

15   constitutional right and when there is a conceded delay, a

16   conceded withholding of complaints, on many days -- though it

17   is only weekend days and holidays where the delay goes on for

18   several days -- on many days we see access that goes below the

19   66 percent average and by a good deal.

20            In his affidavit the clerk of the court very candidly

21   says there are emergencies.  There is one person or two people

22   who do this, they get sick.

23            We think the First Amendment requires a much higher

24   standard.  The weekend filings, our papers describe some of the

25   cases that we didn't see for three and four days.  They didn't

rise to the notoriety of Trump v. Univision, but they were very

important cases that our subscribers would be very interested

in knowing about in our daily litigation reports.

I don't know if your Honor wants me to address their

abstention argument.

THE COURT:  Briefly, if you will.

MR. HIBSHER:  The abstention argument, relying on the

Younger-O'Shea doctrine, we think is inapplicable here.  That

doctrine really contemplates a federal court action that will

interfere with ongoing state court adjudications.  That is not

what this case is about.  What we are looking for is a simple

order directing the clerk to provide timely access.  It is the

very order that was issued in the Jackson case and in the

Planet case.

In the Planet case the district actually granted an

abstention motion, and the circuit court reversed.  In

reversing the abstention order, the Ninth Circuit relied on the

Second Circuit in Hartford Courant.  Neither of those cases

was, by the way, discussed by the defendant in their papers.

This is not the kind of situation that Younger-O'Shea

contemplates where the court is going to involve itself in

conflicted workings of the state judiciary.  All of the cases,

and I will be brief and won't go into them, all of the cases

they cited were dramatically different from the kind of

injunction that we are requesting your Honor to issue.

1          I believe that the kind of injunction that we are

2     asking for is what was issued in the Planet case and the

3     injunction in Jackson, which are the only two cases dealing

4     with delays brought on by clerks processing complaints after

5     they were filed.  The kind of injunctions issued in those cases

6     are exactly the kind of injunction that we want here.  It

7     doesn't constitute an inappropriate interference with the

8     workings of the state judiciary.

9          THE COURT:  Talk about that.  What type of burden, if

10    any, would it impose on the clerk of the court, or cost?

11         MR. HIBSHER:  Our papers say that in the course of one

12    of the meetings that we had with the defendant, the defendant

13    stated that providing the kind of access we are seeking would

14    require some tweaking of the software system.  Our client has

15    been involved in transitioning from paper filing to e-filing in

16    many courthouses around the country and has assisted in that

17    process, and has reported that software providers are typically

18    able to provide the kind of press-only access to new filings

19    with relatively little expenditure, if any, and relatively

20    little expense.

21         It does not require that they keep the courthouse

22    open.  If they want to limit access to credentialed press, that

23    is something that is very easy to accomplish.

24         THE COURT:  Let me ask you very quickly about that.

25    Hasn't the concept of credentialed press expanded tremendously

in recent years?  Can't I start a blog now and declare myself

to be press?

          MR. HIBSHER:  I'm not certain about that, your Honor.

Both this courthouse and the Supreme Court New York County have

certain requirements before an individual member of the press

will be issued a press pass: not required to leave their

telephones at the desk downstairs, admitted to the courthouse

much more easily than other members of the public.

          I have to assume that with the application to achieve

that end, there needs to be some written support from a bona

fide media outlet.  Might it be a blog?  Perhaps.  That is the

sort of detail that I feel very confident the clerk of New York

County will be able to address appropriately and will be able

to protect the kinds of concerns that they may have about

complaints which contain errant information being made

available immediately to the general public.

          THE COURT:  Thank you.

          MR. HIBSHER:  Thank you, your Honor.

          THE COURT:  Mr. Adlerstein, how are you?

          MR. ADLERSTEIN:  Well, thank you, your Honor.

          I can start by advising your Honor where New York

State is in terms of its policies and practices in this area

and where County Clerk Tingling is.  The last thing that New

York State, through its announced policies, has embodied in its

court rules and the last thing that Judge Tingling really wants

to do is to have significant delays in documents that are

accepted by the court for filing disseminated to the press and

public.  I think that all of us in this courtroom are cognizant

of the First Amendment requirements and are sensitive to them

and want to operate within the bounds that they provide.

However, New York State has very sensible policies

that are embodied in its court rules and its statutes.  Two of

the court rules were cited in our papers.  One is the one that

says that in accordance with the C.P.L.R. provision -- and I'm

quoting from New York court rule 202.5(d)(1) -- the court

clerk, the county clerk, as appropriate, shall refuse to accept

certain kinds of papers for filing.  The provision goes on to

enunciate what the various aspects are that the county clerk

ought to be looking for.

Mr. Hibsher in his papers and oral presentation

focuses about change or some kind of major change that

supposedly took place when e-filing went into existence.  The

court rules are promulgated by the administrative board of the

court, which is made up of the chief judge of the state, the

chief administrative judge, and all of the presiding justices

of the four Appellate Divisions.

It promulgated those rules for e-filing that have a

provision that says no later than the close of business on the

business day following the electronic filing of a document

there should be notification that goes out with regard to that

particular document.

THE COURT:  What does that mean?

MR. ADLERSTEIN:  We have discussed with county clerk Tingling this aspect very carefully.  What it means is that when a party, whether it be during the business day or whether it be in the evening or whether it be on the weekend, submits a pleading to the court for filing, what occurs is that there is a review that takes place by a person.

It's not done electronically.  The review process is not done electronically.  It is done by a person who zeros in on the provisions in the administrative regulation that I quoted earlier telling the court clerk that the court clerk has an obligation to review pleadings for certain possible defects.

At that point when the county clerk is to review that document and no later than the business day following that presentation of the document by the intended filer, the county clerk should do those processes and make a determination of whether or not an index number can be issued for that pleading. It is the issuance of the index number that the county clerk does, after a person has eyeballed the pleading, that then puts it into the system for general dissemination.

THE COURT:  That's a policy that, and I want to be careful how I say this, has no particular legal import, correct?

MR. ADLERSTEIN:  It has a very critical administrative

1    impact.

2          THE COURT:  I understand that.  But the types of

3    examples that are discussed in the papers and the types of

4    things that the clerks appear to be reviewing for seem to me to

5    be somewhat ministerial.  Right?

6          MR. ADLERSTEIN:  They are largely ministerial.  If

7    someone were to catch a pleading that was filed that is really

8    a matrimonial action and it is couched in the pleadings as

9    something else, that might be able to be rejected and then

10   straightened out.  There could be some unusual situations.

11         However, there is this directive that the county clerk

12   is supposed to look for things that the court system regards to

13   be important before the issuance of an index number.

14         THE COURT:  Like some typo in the caption?

15         MR. ADLERSTEIN:  Not a typo in the caption, your

16   Honor.  One of the provisions talks about the absence of a full

17   recitation of the parties who are in the caption.  For

18   instance, if somebody sues ten people and puts John Doe, et

19   al., the clerk rejects it because the court doesn't know who

20   the other parties are.

21         THE COURT:  Is a complaint a judicial document?

22         MR. ADLERSTEIN:  Usually, I would say yes.  However,

23   it's not accepted for filing until somebody actually reviews it

24   and it's given an index number.  Whether it's a judicial

25   document before that happens, I think that's not the word of

1   art that's used in the regulations.

2          THE COURT:  In the New York State regulations?

3          MR. ADLERSTEIN:  The regulations are set up so that it

4   is presented by the intended filer, there is an opportunity for

5   a person to review the document, and at that time, if the

6   document is deemed to be free of the defects, it goes in.

7          The answer would have to be I think on balance it is

8   not a judicial document until the court system says it is by

9   issuing an index number.

10         THE COURT:  Is the filing of the document an event of

11  legal significance at all in your mind?

12         MR. ADLERSTEIN:  It would be for statute of

13  limitations purposes.  Here is how it operates.  If the

14  document is deemed to be acceptable so that it gets an index

15  number, then it is deemed to have been filed for statute of

16  limitations purposes when it was first presented.  However, if

17  it is rejected, the document is rejected, it is not deemed to

18  be presented for statute of limitations purposes until it is

19  accepted as having been valid at the time it was presented.

20  That's how that mechanism operates.

21         THE COURT:  In New York State if you file a complaint

22  on the last day of the statute and it has an et al. but

23  otherwise is a valid complaint, the next day the clerk can

24  decline to accept that document, and that litigant is out of

25  luck on the statute?

1          MR. ADLERSTEIN:  The litigant may be, your Honor.  I

2     know that there exists equitable tolling provisions that people

3     can go into court and request to have documents deemed to be

4     filed and that becomes a judicial determination, not something

5     that the clerk does.

6          THE COURT:  What about this afternoon?  What if there

7     is a Christmas party going on across the street at the clerk's

8     office at 60 Centre and they are not able to get to the

9     complaints that came in, say, by noon?  That person can be out

10     of the box because there wasn't a person at the clerk's office

11     to review the complaint in the afternoon?

12          MR. ADLERSTEIN:  I think there are people in the

13     clerk's office in the afternoon, your Honor, for paper

14     documents that are submitted.  But electronically it's deemed

15     to have been received at the time it is electronically

16     presented, and then it is checked out by a person when the

17     court opens on the next business day or the same business day,

18     and at that time there is an index number that is given.

19          The important principle is that it has been the

20     practice uniformly that a person eyeballs the document before

21     the index number is issued, and it is done because of the kind

22     of provision that I mentioned earlier.  It operated that way,

23     your Honor, during the time it was exclusively paper.  I think

24     County Clerk Tingling clarified in his affidavit in response to

25     counsel's papers that it was never a laying in front of the

press or public pleadings before they were reviewed and then

were given an index number.

     THE COURT:  Do you have a sense as the clerk's office

does this review, of the hundreds of complaints that are filed,

how many times they have to kick complaints back because of

some venue issue or because of some et al. issue or some lack

of signature issue?

     MR. ADLERSTEIN:  Yes.  The assessment that I have

heard, your Honor, is that it is a very modest proportion, a

very modest percentage.  I haven't been given an actual

percentage.  What we are talking about is the clerk's office

wanting to be careful, when it takes in a case and assigns it

an index number, to know that it really belongs to the court

and that there is at least some essential structure.  And this

is not just made up by County Clerk Tingling.  This is in

accordance with the regulation that the administrative board of

the courts has promulgated.

     THE COURT:  I understand that.  Let me ask you this.

Obviously, there is a concern on the part of the clerks that

documents be properly formatted and contain whatever essential

elements are required by the regulations.  But you say it's a

modest number that are rejected on that basis.  Talk about the

First Amendment and how -- and it clearly affects the First

Amendment -- how you can justify that process in the face of

the fact that what you are doing is essentially a ministerial

1   review and, second, that the risk that is involved seems to me

2   to be so relatively miniscule: a complaint gets through and

3   they've got the wrong venue.

4          MR. ADLERSTEIN:  Your Honor, I think this gets to the

5   question that your Honor asked of counsel why aren't more

6   people here.  I think County Clerk Tingling's papers exemplify

7   the fact that counsel has really exaggerated the problem.  You

8   do not see people complaining out there that they are not

9   getting access to New York State court pleadings either

10  uniformly or with a degree of promptness which is acceptable.

11  That's not the intention with respect to the way that it is

12  administered certainly.  And the numbers that were contained in

13  the affidavit that was submitted by plaintiff here we showed

14  were exaggerated because they included weekends.

15         THE COURT:  They took out the weekend and holiday

16  papers.

17         MR. ADLERSTEIN:  They did.  But there is something

18  very interesting about the numbers.  They created a new chart.

19  They had an initial chart which had on it one column which was

20  one-day, and then the second one was two-day plus.  When we

21  called them on the fact that they were including weekends and

22  holidays, they took out the two-day plus column, and instead

23  having a one-day column, they created a new column called

24  one-day plus.

25         If you take a look at the numbers that they

accumulated, they come up with a figure of overall statistics

of 2 or more days' delay, and it is pretty much the same number

of matters which were filed on Fridays.  I think Mr. Hibsher

mentioned when your Honor gave an example that it was a Friday

that they were talking about with respect to the one-day plus

column --

THE COURT:  Generally, and you folks will correct me

if I'm wrong, if you look just at Monday through Thursday,

there was still a significant percentage of complaints that

they were not seeing because of this administrative review

process, correct?

MR. ADLERSTEIN:  There would be cases that would be

filed at the end of the day.  Mr. Hibsher is not asking, I

don't believe, for personnel to be assigned to work in the

courthouse past 5 o'clock.  He has advised your Honor that the

plaintiff is not looking to keep the courthouse open past 5

o'clock.  We put in our papers that there is a lot of budgetary

considerations that apply there.

THE COURT:  Tell me about those.  It sounds as if all

that is really required is maybe an additional terminal and

some software that would allow them -- I don't even know if it

is additional software, because apparently they have remote

access now -- allow them to remote access at an earlier period

of time.

MR. ADLERSTEIN:  That creates some difficulties about

1  how you set that up, about who is going to come in to get that

2  access and trying to make distinctions between how people are

3  going to get credentialed, whether or not favoring the

4  credentialed press over the public in terms of the access that

5  the public would have to documents.  You would have to have all

6  of those determinations resolved.

7      Basically, what you are talking about is departing

8  from the very important operating principle that New York State

9  courts have had going forward and that is called for under the

10 regulations, which is that when a document is submitted for

11 filing and to commence a litigation -- and it would need to be

12 during normal business hours because the court is not going to

13 easily hire people to work overtime and so on in order do

14 this -- it would need to be reviewed by a person before it is

15 accepted for filing and then disseminated.  That's what the

16 regulations say.

17     THE COURT:  You can still do that, right, without

18 preventing the press from having access?  You can do all that

19 and I'm sure you will do all that.

20     MR. ADLERSTEIN:  You can have people working 24 hours

21 a day, I suppose.

22     THE COURT:  Unless I'm completely misreading both sets

23 of papers, that's not what they are asking for and that is not

24 what would be required.  Essentially what would be required is

25 before your staff gets through something that is e-filed, it

 1   gets made available to the press, at least to the press.

 2         MR. ADLERSTEIN:  Your Honor, if I may add one thing?

 3         THE COURT:  Sure.

 4         MR. ADLERSTEIN:  We have direct filing by pro ses.

 5   They can apply to be able to e-file and then they can e-file.

 6   You have the difficulty that would pertain that you don't know

 7   what a pro se complaint is going to look like when it comes in.

 8         I'm not sure how the federal courts handle the pro se

 9   registration process and what the pro se clerk does with pro se

10   complaints and whether they are made immediately available by

11   the federal court as soon as they hit the computer or whether a

12   pro se can just go ahead and file from the outside and register

13   without any kind of supervision so that those complaints are

14   eyeballed by a person before they are distributed to the

15   general public, but I suspect they might not be.

16         THE COURT:  I think you are probably right.  I think

17   it also depends on whether they are in forma pauperis or not.

18         MR. ADLERSTEIN:  Yes.  You have those kinds of

19   situations where they are pro se complaints as well.

20         THE COURT:  That is also an easy software fix, isn't

21   it?

22         MR. ADLERSTEIN:  I don't know.  I don't know what kind

23   of programming you would need to do in order to put in a

24   registration of all attorneys and have software be able to

25   recognize who is filing.  Think there are some difficulties

there of a practical nature that are not necessarily so easy in

terms of setting it up.

THE COURT:  Mr. Adlerstein, the case law that has been

presented here is fairly unanimous against the position that

you are taking.  How do you want me to analyze the cases that

they have cited from California and Texas?  How do you suggest

that I analyze the state courts' procedures in light of Second

Circuit authority about a complaint and the Second Circuit said

yes, the filing of a complaint -- first of all, a complaint is

very easily determined to be a judicial document; it was an

easy determination by the Second Circuit.  You seem to have a

little trouble with it.

MR. ADLERSTEIN:  I think, your Honor, the Second

Circuit cases have not dealt with this kind of a situation

where you are talking about this kind of very quick processing.

You are talking about principles relating to what kinds of

documents would be deemed to be a judicial document so that

they would need to be available to the public.  The court

enunciated the word "immediate" without putting a definition on

it.  We submit to the Court that the New York State courts have

already a policy which is consistent with the First Amendment

in terms of the next business day.

THE COURT:  The next business day is immediate?

MR. ADLERSTEIN:  I think it is immediate enough under

the First Amendment.  Secondly, if you take a look at the cases

1  in California, the district court in California, which had the

2  most recent opinion on the case on remand from the Ninth

3  Circuit, said it need not be the same day.  They are not going

4  to declare that there is a constitutional requirement that it

5  has to be on the same day.  The Ninth Circuit, when it

6  remanded, expressed some skepticism about how immediate it was

7  going to have to be, whether it would have to be on the same

8  day.  So it is not resolved there.  I'm told that the

9  litigation is actually still going on in California.

10          Secondly, the clerk in California was absolutely

11  intransigent.  Take a look at the district court opinion.  The

12  first page talks about the fact that he withheld documents from

13  the press for weeks and that there was something going on there

14  relating to him and the way that he was handling things to

15  deliberately obstruct the press.

16          Here we have nothing of the kind.  We have a New York

17  State court system which is operating pursuant to regulations.

18  The last thing that County Clerk Tingling wants to do is to

19  hold up these documents.  What we are talking about is the very

20  principle of able to have a person during business hours review

21  the document before it is assigned the index number and

22  distributed to the press or public.  And I'm told that once it

23  is available, it is available to the entire public.

24          THE COURT:  I understand that.  That's precisely what

25  we are talking about.

1           MR. ADLERSTEIN:  You are inquiring about the case law

2    being possibly against our position.  I submit to the Court

3    that it doesn't come anywhere close to our situation, to a

4    state entity which is handling itself as responsibly as New

5    York State does.

6           THE COURT:  As I understand at least one of the cases,

7    it is a state court where the court presented what he or she

8    believed to be a very reasonable position: that once complaints

9    are received, they need to be reviewed, and only when that

10   administrative review takes place will they be made available

11   not only to the press but to everyone else.  That is precisely

12   what we are talking about here, isn't it?

13          MR. ADLERSTEIN:  Not really.  We put in our brief that

14   what the clerk was going through there were many more steps,

15   things like putting labels on files, getting paper files set up

16   before documents would be made available to the press.

17          THE COURT:  What is the danger here, Mr. Adlerstein?

18   What is the danger of providing immediate access to filings?

19   What would be the damage to the general public, the people of

20   New York County?

21          MR. ADLERSTEIN:  Your Honor, there has been a

22   determination that's been made by the administrative board that

23   the administrative board wants the county clerks to look at

24   some things before filings are completed.  There has been a

25   determination by the administrative board that the public

1    dissemination should be done by the next business day.

2         It is clear that many, many are provided the same day,

3    and even within a very, very short period of time, just a few

4    minutes.  When you have the clerk there and they are working on

5    these things, there is no holdup.  It's provided.  Counsel may

6    have shown a couple of instances where there was an issue, but

7    this really isn't the pattern.  It is not what the City of New

8    York is all about.  It's not what the county clerk is all

9    about.

10        THE COURT:  I understand that they don't mean to hold

11   up anything in an improper way.  Still, the percentage that are

12   not provided, even when you discount holidays even when you

13   discount weekends, the percentage that are not provided on the

14   same day is substantial.  By "substantial" I mean more than 25,

15   30 percent.  Correct?

16        MR. ADLERSTEIN:  It depends on how you measure same

17   day.  If something comes in at 3:00 or 4:00 in the afternoon

18   and the county clerk doesn't have personnel on hand to be able

19   to process those until the next business day, it will get done

20   at 9:30 or 10:00.

21        THE COURT:  Just so we are clear: something comes in

22   at 3:30 in the afternoon on Monday, same day is Monday.

23        MR. ADLERSTEIN:  I understand.  What I'm saying is

24   yes, there will be instances where something will come in in

25   the later part of the afternoon and it won't be looked at until

1   the following business day, as New York State regulations

2   permit under their prescription, and it will be done.  I think

3   the objective of the county clerk is not to sit on those types

4   of instruments until the very end of the next business day.

5          THE COURT:  I wasn't making any suggestion that it is.

6          MR. ADLERSTEIN:  It gets done very early in the

7   morning, when there are people there to do it.

8          It is pointed out to me, your Honor, that if that is

9   going to be the definition, we are not sure that the numbers

10  that have been put out there by the plaintiff, you are talking

11  about something that arrives at 3:30 in the afternoon and then

12  gets done by 10:00 in the morning, is really part of the

13  numbers that they are throwing out there.

14         THE COURT:  I don't intend to draw any bright-line

15  definition.  Thank you.

16         MR. ADLERSTEIN:  You're very welcome.

17         THE COURT:  Mr. Hibsher.

18         MR. HIBSHER:  Thank you, your Honor.  I think I heard

19  for the first time what the alleged harm would be if the policy

20  of reviewing before access is provided to the press and public

21  is granted, and it has been characterized as modest.  We don't

22  have numbers.  We pointed out in our papers and I said before

23  that the cases make very clear that empirical data needs to be

24  presented to illustrate the kind of harm that the defendant

25  alleges in order to meet its burden under the shifting in this

1    kind of First Amendment entitlement case.

2         I also would like to say that the rule that Mr. Adler-

3    stein points to which provides for notification by the end of

4    the next business day is inadequate under the First Amendment.

5    When you asked me about delays before, I was looking for a

6    particular quote that I wanted to mention.  It comes from the

7    Globe Newspaper case.  That case said that delaying access for

8    as little as a day delays access to news, and that delay

9    burdens the First Amendment.  So the next business day is not

10   acceptable.  That is an issue which this case presents for your

11   Honor to decide.

12        The particular regulation that Mr. Adlerstein points

13   you to, however, says that the filer will be electronically

14   notified by the end of business the next day.  That is too

15   late.  If it's a complaint, the filer is the plaintiff and the

16   plaintiff will be notified the next business day.  We do not

17   think that that rule, even if they were adhering to it all the

18   time, really meets the First Amendment obligations that they

19   have here.

20        You asked Mr. Adlerstein about when a document

21   becomes, I believe your words were, an official court document.

22   He conceded that when a document is filed, it tolls the statute

23   of limitations.  But he provided a hypothetical in which the

24   clerk might review the document and reject it and then arguably

25   the filer would not have the benefit of the statute of

limitation.

They did not cite any cases in their brief to that end, nor did they comment on the Appellate Division, Third Department case that we cited in footnote 6 of our moving brief on page 15, which presents this very question: whether a petition was filed for statute of limitations purposes upon arrival at the clerk's office or upon an assignment of an index number.

That is the Johnson case, which concluded that on arrival at the check's office is when the filer benefits from the tolling of the statute of limitations. It's not exactly what we are talking about, but it's pretty close in New York law. I did not see anything in their papers that explicated the argument that Mr. Adlerstein makes today with any kind of legal citations.

You also asked about pro se filings in the federal court. My understanding is that that is done by paper, that pro ses do not electronically file. There is a paper desk, and the press has access to pro se filings as soon as they are done. If your Honor wishes, I can get you a supplemental declaration on that point.

Mr. Adlerstein talked about the Planet case in the Central District of California. He described the clerk there as being intransigent. I think that is probably a fair characterization at the beginning of the case. The case went

1    on for years.  It went up to the Ninth Circuit two times.

2            But when Judge Otero, from the Central District of

3    California, issued the injunction that he did last May, I

4    believe.  At that time the clerk was contending that they were

5    providing same day access in 97 percent of the filings.  The

6    system had completely changed from the days of intransigence.

7    They were photocopying cases as soon as they came in.  They

8    were scanning them, and they were providing much improved

9    access.

10           Yet Judge Otero said that the access they were

11   providing was not adequate.  He directed them to provide timely

12   access upon receipt -- this is the language of the order -- and

13   precluded the clerk from doing any administrative process

14   before providing access.  I think the reason was that he was

15   not persuaded that the kinds of things they were looking for

16   really rose to the kind of potential harm that would overcome

17   the First Amendment right of access, and the kinds of things

18   that the New York County Clerk is looking for similarly do not

19   do that.

20           You asked me earlier where are all the members of the

21   press.  CNS has 27 hundred subscribers.  Many press outlets are

22   our clients.  They look to us to provide reports on civil

23   litigation.  Some of these litigations are not the most

24   newsworthy cases.  You don't see many reporters in the press

25   room either in New York supreme or even in the Southern

1    District.  In a certain sense not only is CNS as a media outlet

2    a surrogate for the public, it is also a surrogate for the

3    press.  It is like the AP wire service.

4          So, the significance to CNS of the kinds of delays

5    that we are seeing, the 30 percent delays to next-day cases

6    being provided after the news cycle has really come to an end

7    is really enormous.

8          Implicit in one of the questions was a question about

9    CNS's motivation in seeking this First Amendment right.  What

10   Lugosch in the Second Circuit said of this question is that

11   consideration of the newspaper's ultimate interest in the case

12   should not affect the weight of the presumption, the First

13   Amendment presumption.  Those interested in monitoring the

14   courts may well learn of and use the information, whatever the

15   motive of the reporting journalist.

16         No one is impugning the motive of CNS here.  But the

17   fact is that motive is not the issue at all.  There is a First

18   Amendment right to a filed judicial document, which admittedly

19   tolls the statute of limitations.  The delay of a substantial

20   number for one day and of those filed in the evening and on

21   weekends for several days is not acceptable under the First

22   Amendment, and respectfully I do not believe that the defendant

23   has met its burden.

24         THE COURT:  Thank you.

25         MR. ADLERSTEIN:  Your Honor, may I?

1          THE COURT:  Absolutely.

2          MR. ADLERSTEIN:  I wanted to comment on just one or

3     two points very briefly.  In terms of this constitutionality

4     argument relating to the regulations that I had cited, in

5     plaintiff's opening papers there was no recognition provided

6     for the regulations.  There was no request that anything be

7     struck down for constitutionality purposes.

8          One of the reasons that we mentioned to the Court the

9     principles of abstention and comity was just this very thing.

10    We ask the Court take into consideration the important

11    constitutional value that lies with regard to a federal court

12    providing for measures which are going to change operations in

13    a state court and that a federal court would be careful about

14    those things and measure constitutional principles on that

15    plane.

16          I think if we are talking about the Court potentially

17    making a ruling that the regulation that was enunciated by the

18    administrative board may not pass constitutional muster, we

19    ought to see it in that light.  We think it does.

20          THE COURT:  First of all, I don't think that

21    plaintiffs are asking me to declare the regulations

22    unconstitutional.  The regulations, constitutional or not, they

23    are not asking me to touch.  The only things that they are

24    asking is, sure, go through your process, but you've got to

25    allow access at an earlier point in time.

1          MR. ADLERSTEIN:  When we brought up in regulations,

2     they suggested in their papers that the Court could well

3     declare the regulations to be improper for constitutional

4     purposes.  That was an argument that was presented in their

5     papers, and they cited case law to that effect.

6          THE COURT:  Okay.

7          MR. ADLERSTEIN:  Also, the very fact about will this

8     be limited to New York County, obviously, something that will

9     happen in one county could well affect what happens in all.

10    The consequences in terms of court operations in the New York

11    State courts in the broad sense could be much broader than Mr.

12    Hibsher would suggest.  I request that in weighing these

13    various values that have been presented here, your Honor take

14    that into consideration.

15          Lastly, with regard to the Fourth Department case that

16    was cited, I had explained that the statute of limitations

17    seemed to be tolled when it was presented.  However, it's not

18    considered to be valid until it is assigned an index number, so

19    it reverts to the date of presentation for statute of

20    limitations purposes, which is not inconsistent with what

21    counsel has argued.

22          THE COURT:  I'm sorry.  I lost you on that last point.

23          MR. ADLERSTEIN:  In other words, the principle about

24    statute of limitations is when the document is presented to the

25    court by the filer, if the courts deem the document to be

acceptable and it gets an index number on a later date, it's

deemed to be filed on the date that it was first presented.  It

is dependent on it being found to have been valid when

presented by the fact that that document gets an index number.

That principle I think is consistent with the case law that Mr.

Hibsher has presented.

        MR. HIBSHER:  Your Honor, C.P.L.R. 304(c) says that a

document tolls the statute of limitations upon filing.  There

is no language in that provision that says upon filing and

after review by the clerk's office and the affixing of an index

number, and there is nothing in the defendant's answering

papers that says anything along these lines that certainly

provides any authority for that conclusion.  That may be their

argument, but there is nothing in the law that says that.

        If I'm a plaintiff who files a case that gets kicked

back because I only had the first name or I had five names and

then said et al., and they reject it the next day, which is

beyond the statute of limitations, you can be certain that I'm

going to litigate that issue and create some law on this point,

which I do not believe exists.  We have looked at it.  The only

case that came close was the Third Department case that we

cited in our brief and that I mentioned before.

        We are not seeking a declaration that rule 202.5(b)(d)

is unconstitutional.  That rule does not require the clerk to

withhold publication of a filed court complaint to the press.

That rule merely requires the clerk to do some processing by

the next business day and to notify the filing party.

You didn't see a request for a declaration of

unconstitutionality as to that rule in our papers because we

don't believe that that is necessary.  We believe that we are

entitled to access upon filing without review, and that may

translate into access on the same day that a case is filed.

MR. ADLERSTEIN:  Your Honor, for C.P.L.R. purposes, if

I may, the date of filing is considered to be the date the

index number is issued.  The regulation says the clerk shall

refuse to accept for filing documents that are defective in the

ways that are outlined by that regulation.  I ask the Court to

take that into consideration when dealing with this particular

point.

THE COURT:  Give me five, ten minutes.  I'll be out

with a decision.  Please don't go far.

(Recess)

THE COURT:  It is the Court's conclusion that

plaintiff's motion for preliminary injunction will be granted.

I find that the clerk may not prevent the press from accessing

newly filed documents because of its review and logging

procedures.

However, the Court will look to the party in the first

instance to devise a procedure whereby the press will have

timely access to those documents, whether that means constant

feed or feed during business hours only or remote feed or

otherwise.  Again, I will leave it up to the parties in the

first instance, as there has been no particular method that's

been presented to the Court.

Let me first talk about abstention.  I did consider

this issue very seriously, and I find that abstention not

required.  The defendant in its papers argued that the Court

should abstain because it would require the type of federal

court oversight forbidden under the principle of comity

articulated in O'Shea v. Littleton and Younger v. Harris.

The Ninth Circuit has explained that O'Shea abstention

is inappropriate where the requested relief may be achieved

without an ongoing intrusion into the state's administration of

justice but is appropriate where the relief sought would

require the federal court to monitor the substance of

individual cases on an ongoing basis to administer its

judgment.  Moreover, that some additional litigation may later

arise to enforce an injunction does not itself justify

abstaining from deciding a constitutional claim.  That was in

the Planet case, reported at 750 F.3d 776, 790-92.

As in Planet, this Court finds that the remedy sought

by CNS poses little risk of an ongoing federal audit or a major

continuing intrusion of the equitable power of the federal

courts into the daily conduct of state proceedings.  Again,

citing to O'Shea, which is reported at 414 U.S. 488.  This does

not present the level of intrusive relief sought in cases cited by the clerk.

Compare Hartford Courant v. Pellegrino, reported at 380 F.3d 83, which declined to abstain in case seeking access to docket sheets in Connecticut state court, with Kaufman v. Kaye, reported at 466 F.3d 83, which abstained from entertaining a request that state establish a new system for assigning appeals to justices in the Second Department; and Wallace v. Kern, reported at 481 F.2d 621, reversing a district court's order directing that the clerk place all pro se motions on the court's calendar.

With respect to the preliminary injunction, to obtain a preliminary injunction the moving party must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  Citing Winter v. Natural Resources Defense Council, reported at 555 U.S. 7.

Even if the moving party can only demonstrate serious questions going to the merits rather than a likelihood of success, the preliminary injunction may nonetheless issue if the costs outweigh the benefits of not granting the injunction. Citing Citigroup Global Markets, Inc. v. VCG Specialty Opportunities Master Fund Limited, reported at 598 F.3d 30. CNS has demonstrated a likelihood of success on the merits.

1           The Second Circuit has held that complaints are

2    judicial records that are subject to a presumption of public

3    access under the First Amendment.  Citing Bernstein v.

4    Bernstein Litowitz Berger & Grossmann LLP, reported at 814 F.3d

5    132.  In that case the Second Circuit stated that public access

6    to complaints allows the public to understand the activity of

7    the courts, enhances the court system's accountability and

8    legitimacy, and informs the public of matters of public

9    concern.

10          In light of the values which the presumption of access

11   endeavors to promote, a necessary corollary to the presumption

12   is that once found to be appropriate, access should be

13   immediate and contemporaneous.  The newsworthiness of a

14   particular story is often fleeting.  To delay or postpone

15   disclosure undermines the benefit of public scrutiny and may

16   have the same result as complete suppression.  Each passing day

17   may constitute a separate and cognizable infringement of the

18   First Amendment.

19          Citing Grove Fresh Distributors, Inc. v. Everfresh

20   Juice Company, reported at 24 F.3d 893.  See also Lugosch v.

21   Pyramid Company of Onondaga, reported at 435 F.3d 110,

22   collecting cases, including Grove Fresh, and noting that our

23   public access cases and those in other circuits emphasize the

24   importance of immediate access where a right of access is

25   found.

1          To overcome the First Amendment right of access, the

2     proponent of sealing must demonstrate that closure is essential

3     to preserve higher values and is narrowly tailored to serve

4     that interest.  Broad and general findings and conclusory

5     assertions are insufficient to justify deprivation of public

6     access to the record.  Specific on-the-record findings are

7     required.  Again citing Bernstein v. Bernstein.

8          State law and court rule provide that paper filings

9     are deemed filed for purposes of the statute of limitations

10     upon their acceptance by the clerk's office or when filed by

11     electronic means at the time of the electronic receipt within

12     the New York State ECF.

13          Upon receipt, the clerk's office reviews the proposed

14     filing for complains with venue, caption, case type, as well as

15     the attorney's signature certification required by court rule.

16     In addition, the clerk's office reviews the papers to ascertain

17     whether they contain materials that, by operation of law, may

18     not be made available to the general public.

19          After this review process is completed, new civil

20     matters are logged with a case or docket number and sent to the

21     clerk's filing room for storage.  New case filings are not made

22     available for viewing by the public until this review and

23     log-in process is complete.

24          According to the clerk, the review process is critical

25     to (1) establish a compliance of the filing that the require-

1    ments proposed by state law and court rules, (2) assure

2    attorney compliance with certain of their ethical obligations

3    in commencing legal actions in state courts, and (3) avoid

4    mistakes in filing venue or case type, which can have serious

5    consequences to the statutory protections to the

6    confidentiality of parties in certain proceedings.

7          With respect to this, citing to the Tingling

8    declaration at paragraph 10.

9          The clerk argues that the review process procedures

10   are prescribed to prevent a narrow category of errant pleadings

11   at the outset in order to prevent confusion and waste.  In

12   Courthouse News Service v. Planet, the Central District of

13   California considered a similar review policy allegedly

14   designed to protect the confidentiality of those filing

15   complains and third parties, to ensure information is

16   accurately input, to ensure that proper accounting procedures

17   are followed, and to maintain the integrity of the case file.

18         The court concluded that the clerk failed to meet its

19   burden of demonstrating that its policy of refusing to provide

20   public and press access to newly filed complaints until they

21   are processed is either essential to preserve higher values or

22   is narrowly tailored to serve a substantial government

23   interest.  Accordingly, the court entered an order prohibiting

24   the clerk from refusing to make complaints available until

25   after they were processed and directing the clerk to make such

complaints accessible to the public and the press in a timely

manner from the moment they are received by the Court.

        Similarly, in Courthouse News Service v. Jackson, the

Southern District of Texas considered whether 24- to 72-hour

delays in access were constitutional where the delays resulted

from the clerk verifying filings for correct case number,

proper court, accurate title of document, and proper category

before they are made available to the public.

        The court found that the delay in access to newly

filed petitions in this case is not a reasonable limitation on

access.  Even if it were, the court found that the clerk failed

to demonstrate that the 24- to 72-hour delay in access is

narrowly tailored to serve such an interest and that no less

restrictive means of achieving that interest exists.

Accordingly, the court granted CNS's motion for a preliminary

injunction and ordered the clerk to give CNS access on the same

day petitions are filed.

        As in Planet and Jackson, this Court finds that the

clerk has failed to meet its burden of demonstrating that its

policy of refusing to provide the public and press access to

newly filed complaints until after they are reviewed and logged

is either essential to preserve higher values or is narrowly

tailored to serve that interest.

        In addition, the Court finds that CNS would be

irreparably harmed without the injunctive relief.  As the court

noted in <u>Lugosch</u> and as I indicated earlier, the loss of First

Amendment freedoms even for minimal periods of time

unquestionably constitute irreparable jury.  That is <u>Lugosch</u> at

435 F.3d at 127.

I further find that the balance of hardships tips in

CNS's favor.  CNS will be denied its First Amendment right of

access to new case-initiating documents unless the Court issues

this preliminary injunction while the clerk has alternative

constitutional ways to address its administrative concerns.

I note in this regard that this injunction in no way

restricts or comments on the regulations that are in place for

the clerk of the court to review and accept for filing or

accept for an index number the complaints when they are filed.

Finally, I find that injunctive relief would serve the

public interest.  There is, of course, an important First

Amendment interest in providing timely access to new case-

initiating documents.

With respect to the bond, I order the plaintiff to

post a bond in the amount of $5,000 by no later than Tuesday of

next week.  What date is next Tuesday, Ms. Rivera?

MR. ADLERSTEIN:  The 20th, your Honor.

THE COURT:  By Tuesday, December 20th, 5:00 p.m.

That constitutes the decision of the Court.

Mr. Hibsher, anything further?

MR. HIBSHER:  No, your Honor.  Thank you.

```
 1              THE COURT:  Mr. Adlerstein?

 2              MR. ADLERSTEIN:  Your Honor, the one thing I wonder

 3    about your Honor's ruling is how immediate it is.  The county

 4    clerk is going to need to come up with a plan in combination

 5    with the court system in order to implement what your Honor has

 6    ordered.  I would suggest that a time period be prescribed.

 7              THE COURT:  I'm happy to do that.  Mr. Hibsher?

 8              MR. HIBSHER:  Your Honor, I don't have a position on

 9    that.  I think if your Honor ordered that this preliminary

10    injunction would take effect in 20 days, that would be

11    adequate.  I don't know what the plan is that Mr. Adlerstein is

12    referring to.

13              But I can say, your Honor, that after the preliminary

14    injunction was issued in the Jackson case, the parties met and

15    conferred and they came to an agreed-upon permanent injunction.

16    As you know from our papers, I'm delighted to sit down with Mr.

17    Adlerstein to achieve that end if at all possible.

18              MR. ADLERSTEIN:  Your Honor, we have the holidays

19    coming up.  If we are talking about some kind of a

20    technological solution here, which is one of the possibilities

21    I think that was thrown out, that takes a little bit of time to

22    set up.  I would request that we have until the beginning of

23    February to confer and come up with a plan.

24              THE COURT:  Mr. Hibsher?

25              MR. HIBSHER:  If Mr. Adlerstein is making a
```

1   representation that technological facilities to provide the

2   kind of access that we described in our papers and in our

3   argument will in fact occur by the beginning of February, we

4   would be agreeable to that.

5       MR. ADLERSTEIN:  I don't know if they can occur, but I

6   think we can come up with a plan and define what is to be done.

7   We are operating here without knowing for sure exactly how this

8   is going to be set up.  I think the county clerk needs some

9   time in order to do that.

10      THE COURT:  Why don't we set this down for a status

11  conference -- what makes sense? -- first week in January.

12  Between now and then I expect that the parties will have met

13  and conferred and come up with a plan going forward.  If it

14  appears that there are going to be issues, tee them up as best

15  as you can and bring them to my attention.

16      MR. ADLERSTEIN:  Your Honor, could we make it the

17  second week?  The reason is the holidays.

18      THE COURT:  I understand.  Ms. Rivera?

19      THE CLERK:  January 12, 2017, at 12:30 p.m.

20      THE COURT:  Okay?  Is there anything else?

21      MR. HIBSHER:  No, your Honor.

22      THE COURT:  In that event, we are adjourned.  Happy

23  holidays to everyone.

24          (Adjourned)

25